**GENERAL MOTORS CORPORATION,**
Plaintiff,

v.

**CADILLAC MARINE & BOAT CO., and**
Ash Craft Co., Michigan corporations, Defendants.

Civ. A. No. 3176.

United States District Court
W. D. Michigan, S. D.

Feb. 12, 1964.

**718**

Barnes, Kisselle, Laughlin & Raisch, Detroit, Mich., Arthur Raisch, Detroit, Mich., of counsel, Nims, Halliday, Whitman, Howes & Collison, New York City, Walter J. Halliday, New York City, of counsel, Patrick H. Murphy and George R. Mosher, Jr., Detroit, Mich., for plaintiff.

McCobb & Heaney, Grand Rapids, Mich., Robert C. C. Heaney, Grand Rapids, Mich., of counsel, for defendants.

FOX, District Judge.

Plaintiff,[1] General Motors Corporation, is a Delaware corporation, having its principal office and an established place of business in Detroit, Michigan, and is the successor to General Motors Corporation, a New Jersey corporation, Cadillac Motor Car Company, a Michigan corporation, and Cadillac Automobile Company, a Michigan corporation which was organized in 1902.

Cadillac Marine & Boat Co., the original defendant, was a Michigan corporation organized September 9, 1953, with its principal place of business in Cadillac, Michigan.

Cadillac Marine & Boat Co. was a wholly owned subsidiary of Wagemaker Company, Inc., a Michigan corporation. In 1960 and 1961, after a series of changes of stock control, that company became Ash-Craft Co., which is now one of the defendants in this action.

In September 1961, stock control of defendant Ash-Craft Co. was transferred to New Kanawha Corporation, a West Virginia corporation, of which Ash-Craft Co. is now a wholly owned subsidiary.

About the same time, defendant Ash-Craft Co. organized a new Michigan corporation under the name "Cadillac Marine & Boat Co.," which is now one of the defendants herein, but which has conducted no business since its incorporation.

Also, in September 1961, the original defendant, Cadillac Marine & Boat Co., was dissolved. The right of Cadillac Marine & Boat Co. to the use of the name "Cadillac" in its corporate name or on its boats was validly transferred to defendants Ash-Craft Co. and New Kanawha Corporation.

In November 1962, defendant Ash-Craft Co. and New Kanawha Corporation filed petitions for reorganization under Chapter X of the Bankruptcy Act in the

---

1. "Plaintiff" is used to refer to plaintiff and its predecessors where applicable. "Defendant" is used to refer to Cadillac Marine & Boat Co., (original defendant, since dissolved) Ash-Craft Co. and new corporation named Cadillac Marine & Boat Co., or together, where applicable.

United States District Court for the Southern District of West Virginia.

This case arises under the Trademark Act of July 5, 1946, as amended, Title 15 U.S.C. § 1051 et seq.; there is also diversity of citizenship of the parties. This court has jurisdiction over the subject matter and the parties.

Plaintiff and its predecessors are and have been engaged in the manufacture, advertising and sale of a veritable cornucopia of products, including automobiles, automobile engines, marine engines, and parts, accessories and equipment. Since 1902, they have manufactured, advertised and sold "Cadillac" automobiles, automobile engines, parts and accessories.

Plaintiff is the owner of the following registrations in the United States Patent Office in regard to the "Cadillac" trade-mark:

| Mark | Registration No. | Registration Date |
| --- | --- | --- |
| "Cadillac" | 201,694 (renewed) | August 4, 1925 |
| "Cadillac" crest | 201,708 | August 4, 1925 |
| "Cadillac" | 647,241 | June 18, 1957 |
| "Cadillac" crest and "V" design | 658,918 | February 25, 1958 |

On August 4, 1925, General Motors secured a registration in the United States Patent Office of the name "Cadillac" in block letters, Trade-Mark 201,694 for "automobiles, in Class 19, vehicles, not including engines, * * *."

On the same day, the plaintiff secured a registration in the Patent Office of a crest with a crown top for the same limited purpose.

On June 18, 1957, plaintiff registered a Service Mark, No. 647,241 for: "Maintenance and repair service for automotive vehicles, parts and accessories, in Class 103," the name "Cadillac" in block letters.

On February 25, 1958, plaintiff registered Service Mark No. 658,918 for: "Maintenance and repair service for automotive vehicles, parts, and accessories, in Class 103."

Plaintiff has used the word "Cadillac" in block and script letters, alone and in combination with a "Cadillac" crest and "V" design, as trade-marks on its products since about 1902. Plaintiff has for many years used the word "Cadillac" as part of the trade-name "Cadillac Motor Car Division" in conjunction with the sale and advertising of its goods.

The combination of the "V" and crest is stated in the registration of February 25, 1958 as "first in use before 1947; in commerce in or before 1947; in 1903 as to the coat of arms."

Plaintiff has sold over two million automobiles under its "Cadillac" trademark, one million of these during the last ten years. It has spent millions of dollars in advertising, with more than $40,000,000 allocated for advertising during the past ten years alone.

The word "Cadillac" has come to identify plaintiff and no one else, to the purchasing public as a source or origin of automobiles, automobile engines, parts, accessories and related goods and services thereto. It does not, however, identify plaintiff as the source or origin of small boats in the channels of the boating industry, nor does it identify plaintiff as the possessor of the trade-mark "Cadillac" for small boats.

Plaintiff's manufacturing, advertising and selling under its trade-mark "Cadillac" has been limited to automobiles and component parts. No present or future intention on the part of plaintiff to manufacture or sell boats or marine products under the name "Cadillac" has been established by the evidence.

Plaintiff has never manufactured or sold fishing boats, runabouts, or any boats which substantially approach "the same descriptive properties" of defendant's boats. S. C. Johnson & Son, Inc. v. Johnson, (CCA 2, 1949) 175 F.2d 176, at page 179.

Under the name GM and General Motors, plaintiff does manufacture marine diesel engines for use in a substantially larger class of boats and ships than those which are manufactured by the defendant. From the evidence presented at the trial, these activities were the sum and total of any purported entry by the plaintiff into the marine and boating field.

In 1953, defendant began manufacturing runabout type aluminum boats in Cadillac, Michigan. It located in Cadillac as a result of an invitation from the Cadillac Chamber of Commerce.

Consistent with the long practice of naming products and industries after the city in which an industry is located and the tradition of geographical trade names, the defendant's officers, in good faith, decided to name the corporation and the boat after the City of Cadillac and Lake Cadillac.

The Michigan Corporation and Securities Commission approved the defendant corporation's charter, which was issued in 1954 under the corporate name of "Cadillac Marine & Boat Co."

The defendant Cadillac Marine & Boat Co. first used the trade-mark on its goods December 24, 1953, and on the same day it was first used in interstate commerce.

From 1953 to July 31, 1955, defendant also spent a total of $117,786.81 in advertising boats manufactured by it and identified by the trade-mark "Cadillac."

From December 24, 1953 to August 1, 1955, it sold a total of 5,300 boats bearing the trade-mark "Cadillac." Thereafter, its annual sale of boats was approximately 7,000.

On October 28, 1955, defendant Cadillac Marine & Boat Co. filed an application with the United States Patent Office for the trade-mark "Cadillac" for use on its boats. After consideration of the application by the Commissioner of Patents, the trade-mark "Cadillac" for use on defendant's boats was approved for the purpose of publication in the United States Patent Office Register for March 1956, Application Serial No. 697,-271.

In April 1956, plaintiff filed with the Patent Office a notice of opposition to defendant's application. In December 1956, plaintiff filed an application for extension of the time in which to take testimony in order to discuss settlement. In February of 1957, after the commencement of this suit, plaintiff filed a notice of pendency of the present suit with the Patent Office. As a result of plaintiff's actions, no further proceedings were taken by the Patent Office for registration of defendant's trade-mark "Cadillac."

On April 2, 1957, defendant's counsel, Mr. R. C. C. Heaney, wrote to Mr. George R. Mosher, Jr., General Motors Counsel, restating a settlement offer which defendant had made to plaintiff before commencement of this suit. Defendant offered "to change or eliminate" all claimed similarity of script, design, insignia, and the use of the letter "V", retaining only the use of the name "Cadillac."

In addition, defendant agreed to put a "statement on all its letterheads and other printed forms that it is not a part of nor affiliated with Cadillac Motor Car Company."[2] Plaintiff rejected this offer in a return letter of April 23, 1957.[3]

During 1958 and 1959, defendant began manufacturing a similar type of fibre glass boat, in addition to its aluminum boat. These fibre glass boats were also sold under the name "Cadillac" and were impressed with the crest and the "V" marks. The designs of these marks were not identical to those used by the plaintiff.

---

2. Defendant's Exhibit CC.

3. Defendant's Exhibit DD.

Plaintiff's "V"-crest combination was not registered as a trade-mark until February 25, 1958, which was *after* the commencement of this suit.

Plaintiff contends that the defendant, by its use of the word "Cadillac" and the crests, "V's" and script lettering, infringed plaintiff's registered and common law trade-mark and is guilty of unfair competition. Plaintiff also states that the use of the name "Cadillac" by the defendant confuses, misleads, and deceives the public as to the origin of the goods sold by them, or may lead to confusion in the public's mind.

Plaintiff claims that as a result of this use the defendant is guilty of fraudulent intent, actual or constructive, and should be enjoined from any further use of plaintiff's trade-mark "Cadillac."

For many years Wagemaker Company, Inc. (now defendant Ash-Craft Co.) sold boats under two principal marks, "Wagemaker" and "Wolverine." In 1961, defendant discontinued the use of the "Wagemaker" name. The reason assigned by defendant's President Ash for discontinuing the name "Wagemaker" and using "Ash-Craft" was that "Ash-Craft" was considered a better name to advertise than "Wagemaker."

In its new program defendant has advertised the name "Ash-Craft" with the names "Wolverine" and "Cadillac," in connection with boats for use with inboard and outboard engines. Many of the "Wolverine" boats were identical with defendant's boats marked "Cadillac," except for interchangeable nameplates. "Ash-Craft," combined with the name "Cadillac" is a distinguishing mark of identification.[4]

Defendant's General Manager testified that the "Wolverine" and "Cadillac" nameplates were the same size so that they could be interchanged, and defendant's Vice President testified that the only differences between "Wolverine" and "Cadillac" boats were the decals.

Defendant's aluminum boats range in price from $279 to $998, and its plywood boats from $648 to over $2,000. Defendant listed fifteen aluminum boats and ten plywood boats in their "Wolverine" and "Cadillac" lines at identical prices.

Some of defendant's "Wolverine" and "Cadillac" boats were so constructed that inboard engines could be installed. Defendant advertises such boats simultaneously with boats bearing the word "Cadillac" and in conjunction with statements such as "famed Cadillac quality."

It was apparently in this regard that plaintiff introduced proof that Cadillac engines are converted by individuals and commercial enterprises for use in inboard type boats; but these conversions are done entirely outside the realm of plaintiff corporation.

The engines converted for this purpose are automobile engines manufactured and designed for the Cadillac car; and none of the Cadillac engines are designed, as such, for marine purposes by plaintiff. The water jackets and the safety features which are necessary to accomplish the conversion of the engine to an inboard motor are made by others than the plaintiff.

It is a common practice to convert automobile engines of many manufacturers to inboard use in boats.

The court finds these conversions in no way constitute an entry by plaintiff into the boating industry channels of trade, so as to deny defendant use of the historical and geographical name "Cadillac" on its boats.

In advertising boats, defendant has used display signs, including a neon clock, with the name "Cadillac" superimposed on the outline of a boat, underneath which appears: "The Name That Means The Most In Boats."

Plaintiff further claims that other advertising of defendant shows phrases duplicating or parallelling expressions previously used by plaintiff, or tending to create the same impression, and to foster the mistaken belief that there is a commercial relationship between plain-

---

4. See plaintiff's Exhibits 106 and 117B, and defendant's Exhibit Z.

tiff and defendant on their goods. (Plaintiff lists the following examples in its proposed findings of fact.)

"Buy a Cadillac;"

"You don't baby a Cadillac;"

" 'Cadillac' QUALITY is assured by these fine features;"

"Watch for further proof of Cadillac leadership;"

"Cadillac dealers get a better deal all the way with a fully protected franchise policy;" and

"The huge Cadillac plant—one of the largest in the world."

None of these examples duplicates expressions previously used by plaintiff.[5] The only phrase General Motors ever registered with the Patent Office was "Standard Of The World," which was first used "on or before September 1945, and in commerce on or before September 1945." These registrations were obtained on May 22, 1956, and were for automobile parts, as set forth in Registration Nos. 627,311 and 627,265.

Plaintiff does not have an exclusive property right in generic terms of excellence, superiority or quality.

Defendant discontinued the manufacture of boats in Cadillac, Michigan, in 1961, and is now engaged in the manufacture of aluminum boats in Oak Hill, West Virginia. It also has plans for manufacture of fibre glass boats at its Oak Hill plant.

Defendant denies any confusing similarity of the goods or that they have passed off or induced others to sell or pass off, any of its boats as a product of the plaintiff. The defendant further specifically denies that it has committed any acts calculated to cause purchasers to believe that defendant's products are plaintiff's, or that defendant has competed unfairly with plaintiff in any way.

At a pretrial session on January 29, 1963, the parties entered into a stipulation [6] which provided that the judgment to be entered at the conclusion of the trial should include provisions restraining the defendant from using crests, designs and insignia in any manner which may be confusingly similar to plaintiff's.

Defendant claims that its agreement to this stipulation does not constitute either an admission of wrongdoing by its use of the material described in the stipulation, or that the use of the crest design or "V" insignia was confusing in any manner.

Defendant claims it urged the stipulation and agreed to it in order to shorten the trial and reduce costs.

The Court finds the last paragraph of the stipulation states the single remaining issue to be tried in this case:

"IT IS FURTHER STIPULATED AND AGREED that the issue remaining to be tried by the Court is whether or not defendants shall be enjoined from the use of the word "Cadillac" in any form or manner in connection with their goods."

The stipulation removes questions relating to the distinctive crest, design and

5. See plaintiff's Exhibit 7B, which is a book containing specimens of plaintiff's advertising of Cadillac motor cars in periodicals during the period of 1911–1963.

6. IT IS STIPULATED by and between counsel for the parties hereto that the judgment to be entered at the conclusion of the trial shall include provisions restraining defendants in the terms of Paragraph 1(b) of the prayer of the Complaint, from using, after January 29, 1964, plaintiff's distinctive crests, designs and insignia, as exemplified by plaintiff's exhibits 3F, 3H, 3K and 3M, and from using defendants' crests, designs and insignia as exemplified by plaintiff's exhibits 14, 15, 18, 19, and 20, or any one or more of them, or any other mark confusingly similar thereto, alone, or in combination with any other crests, designs, insignia, or marks in connection with the advertising, offering for sale, or sale of any product not plaintiff's.

IT IS FURTHER STIPULATED AND AGREED that the issue remaining to be tried by the Court is whether or not defendants shall be enjoined from the use of the word "Cadillac" in any form or manner in connection with their goods.

insignia, or any assimilation thereof from further consideration in this case on the issue of whether or not the defendant should be enjoined from using the word "Cadillac."

██ The plaintiff contends, however, that this does not preclude introducing the same material which was covered by the stipulation in evidence since this material as used by the defendant constituted constructive fraud. In the light of the stipulation, this Court finds that this material is admissible only on the issue of constructive fraud.

The issue set forth in the last paragraph of the stipulation may be framed by two questions:

Has the defendant infringed the plaintiff's trade-marks as registered under the federal law?

Has the defendant infringed plaintiff's common law trade-mark?

The decision on both of these questions and the question posed by the stipulation will resolve the issue of whether or not the defendant has a right to continue in the use of the word "Cadillac." Relevant to this decision is a determination of the nature of the word "Cadillac."

"Cadillac" is both an historical and a geographical term. It was an historical term before it became a geographical term. The court will not recite all of the historical aspects of the word "Cadillac". Nevertheless we will consider some highlights.

The name "Cadillac" derives its historical origin from the explorer-soldier Antoine de Mothe Cadillac, who was born in 1660 and died in 1720. It was through him that the name "Cadillac" was first introduced upon the North American Continent, and in the territory around Wayne County and Detroit. Since that time the name "Cadillac" has been continuously appropriated and used as the name of sites for parks, forts, squares, streets, cities and lakes, as well as the name of businesses, enterprises and products. Cadillac Square in Detroit bears the name; streets in both the cities of Detroit and Cadillac also bear the name.

Long before Cadillac Motor Car Company and Cadillac Automobile Company appropriated the name "Cadillac", individuals, corporations and copartnerships had adopted the name "Cadillac" as the name in whole or in part of enterprises and of their products.

Cadillac, Michigan, was settled in 1871 and in 1877 it was chartered as a city under its present name, after Antoine de Mothe Cadillac.

Lake Cadillac also bears the explorer-soldier's name, and the shores of Lake Cadillac are the site of the City of Cadillac.

As evidence of widespread common usage, an examination of the telephone directory of the City of Cadillac, of the City of Detroit, and other cities throughout Michigan and the middle west, will disclose that many businesses use "Cadillac" as part of their name.

The City of Cadillac telephone directory in 1957 listed forty-two companies with the word "Cadillac" in their name and the 1962 Detroit telephone directory listed one hundred forty-seven businesses with "Cadillac" as part of their name, such as Sheraton-Cadillac Hotel, Cal-Connell Cadillac Co., Cadillac Brick Co., Cadillac Fuel Co., Cadillac Glass Co., Cadillac Hardware Co., and Cadillac Malleable Iron Co.

The Michigan Corporation & Securities Commission records reveal fifteen active corporations in Cadillac, Michigan, using "Cadillac" as the first word in their name, forty-four active corporations in the City of Detroit, and fifteen active corporations elsewhere in the State of Michigan. The Commission's records show inactive corporations within the same categories: ten in Cadillac, seventy-seven in Detroit, and eighteen elsewhere in the State of Michigan.

Plaintiff has never been the exclusive user of the name "Cadillac" or the Cadillac seal.

The word "Cadillac" has been registered as part of a trade-mark in the

Patent Office for use on various products by many persons or businesses other than the plaintiff. The name is registered in block, script, and with and without the Cadillac family seal. The products range from dog food, aluminum furniture, writing paper, binoculars, combination storm and screen sashes, sausage, ham, bacon, lard and cheese, shoes, cigars, sewing machines, rubber stamps, steel embossing marking dies, hand marking machines, vacuum cleaners, blowtorches, air blowers and furnaces, stainless steel flatware, wines, women's and children's dresses, cosmetics and other items.

Therefore, the name "Cadillac" as a trade-mark possesses the infirmities of a trade-mark which are characteristic of both an historical and geographic name. This was known to the plaintiff corporation when it appropriated the name. That others would use "Cadillac" as a business name and a product name was a foreseeable consequence.

The crest use by plaintiff has historical derivation. It likewise bears the infirmities due a historical name in the law of trade-marks.

Like the crest, the "V" symbol of plaintiff is also weak. "V" is a letter in the alphabet. It is a common generic symbol. Sir Winston Churchill made it an historical symbol when he regularly used a "V" for victory sign with his fingers. This symbol was adopted by people everywhere.

As used by the plaintiff, the mark "V" has become practically unrecognizable. It has embellished the mark with jewels; made "V's" out of necklaces. It has varied the angle of the "V" until it has become little more than a straight line.[7]

Nearly a century ago, the United States Supreme Court in the case of Delaware and Hudson Canal Company v. Clark, 80 U.S. 311, at page 324, 20 L.Ed. 581, observed:

"And it is obvious that the same reasons which forbid the exclusive appropriation of generic names or of those merely descriptive of the article manufactured and which can be employed with truth by other manufacturers, apply with equal force to the appropriation of geographical names, designating districts of the country. Their nature is such that they cannot point to the origin (personal origin) or ownership of the articles of trade to which they may be applied. They point only at the place of production, not to the producer, and could they be appropriated exclusively, the appropriation would result in mischievous monopolies. Could such phrases as, 'Pennsylvania wheat,' 'Kentucky hemp,' 'Virginia tobacco,' or 'Sea Island cotton,' be protected as trade-marks; could any one prevent all others from using them, or from selling articles produced in the districts they describe under those appellations, it would greatly embarrass trade, and secure exclusive rights to individuals in that which is the common right of many."

A geographical and an historical name, under the trade-mark law, is known as a weak or non-exclusive mark. See 3 Callmann, Unfair Competition and Trade-Marks, Page 1121.[8]

"Generally speaking, trade-marks in a geographical name are narrow in scope." Borg-Warner Corp. v. York-Shiply, Inc., (CCA 7, 1961) 293 F.2d 88, 91. In North American Aircoach Systems v. North

---

7. See plaintiff's Exhibit 7B, pages 6–7, 9, 11–14, 22, 24, 26–27, 35–39, 47–49, 51–52, 59–65, 68–69, 71, 86, 97–98, 134–135, 139–141, and 145–147.

8. Plaintiff claims one cannot call "Cadillac" a weak mark. In a sense this is true. Plaintiff's use of the name "Cadillac" in the automotive industry has acquired a strong meaning. As Judge Denison commented in G. & C. Merriam v. Saalfield, infra: "So it was said that the word had come to have a secondary meaning, although this phrase, 'secondary meaning,' seems not happily chosen, because, *in the limited field*, this new meaning is *primary* rather than secondary; * * *." (198 F. page 373) (Emphasis supplied.)

American Aviation, Inc., 231 F.2d 205, 210, (CCA 9, 1955) the court observed:

"It is extremely difficult to give to a geographical term a proprietary connotation since under ordinary circumstances it cannot be used to exclude others who operate in the same area * * *."

In the case of France Milling Co. v. Washburn Crosley Co., (CCA 2, 1925) 7 F.2d 304, the court was ruling on the use of the words "Gold Medal," and stated at page 306:

"To take another view of the matter, the degree or exclusiveness of appropriation accorded to the originator of a trade-name often varies with the kind of name he originates. If the name or mark be truly arbitrary, strange, and fanciful, it is more specially and peculiarly significant and suggestive of one man's goods, than when it is frequently used by many and in many differing kinds of business."

Clearly, "Cadillac" does not fall under the category of "arbitrary, strange, or fanciful."

Further discussion of "strong" and "weak" marks appears in Treager v. Gordon-Allen, Ltd., (CCA 9, 1934) 71 F.2d 766, 767; American Steel Foundries v. Robertson, 269 U.S. 372, 46 S.Ct. 160, 70 L.Ed. 317; Majestic Mfg. Co. v. Majestic Elec. Appl. Co., Inc., (CCA 6, 1949) 172 F.2d 862; Dwinell-Wright Co. v. National Fruit Co., (CCA 1, 1944) 140 F.2d 618; and Olin Mathieson Chemical Corp. v. Western States Cutlery & Mfg. Co., (C.C.A. 10, 1955) 227 F.2d 729.

■ Since "Cadillac" is both an historical and a geographical term, it is only entitled to very narrow protection, and plaintiff cannot claim the right to exclusive use.

Plaintiff, however, has acquired a right to secondary meaning in the trade-mark "Cadillac" in the automotive field. Concerning secondary meaning, it has been said:

"It contemplates that a word or phrase originally, and in that sense primarily, incapable of exclusive appropriation with reference to an article on the market, because geographically or otherwise descriptive, might nevertheless have been used so long and so exclusively by one producer with reference to his article that, in that trade and to that branch of the purchasing public, the word or phrase had come to mean that the article was his product; in other words, had come to be, to them, his trade-mark." G. & C. Merriam Co. v. Saalfield, (CCA6, 1912) 198 F. 369, at page 373.

■ Thus, it is seen that the appropriation of a geographical or historical term by a second user will be restrained where a secondary meaning has been established, and continued use is likely to create confusion—commercial fraud. How, then, may the existence of secondary meaning be established?

■ The criteria set forth by such cases as Shaler v. Rite-Way Products Co., (CCA 6, 1939) 107 F.2d 82, and American Products Co. v. American Products Co., (E.D.Mich., 1930) 42 F.2d 488, are simply stated as a combination of elements such as long-term usage, considerable effort and expenditure by the producer toward developing a reputation and good will for the trade-mark, resulting in a conscious connection in the minds of the general public of that trademark to the producer's particular business and products.

An aid to the evaluation of the protection afforded plaintiff is the case of Curtis-Stephens-Embry Co. v. Pro-Tek-Toe Skate Stop Co., (CCA 8, 1952) 199 F.2d 407, at page 414, where it is stated:

"The exclusiveness of the monopoly of a descriptive mark with an attained secondary meaning given by statutory registration is limited. It is by no means absolute. The extent of the field to which it extends is circumscribed by the nature of goods specified in the registration to which it is to be applied, the kind of business the registrant is engaged

in, and the likelihood of confusion. (Citations omitted.) *Both the statute and the law of unfair competition confer and protect only the ultimate objective of both—the right to be free from the unfair competition of one who seeks by the use of a similar mark to palm off his products as those of the owner of the trademark.*" (Emphasis supplied.)

Although the Pro-Tek-Toe court was concerned with a descriptive mark, yet its comments apply with equal force to a weak historical and geographical mark.

The Eighth Circuit Court of Appeals in the Pro-Tek-Toe case sustained the trial court in its holding that the secondary meaning doctrine did not apply, since the products involved reached the public through different channels, and, there was no evidence of confusion, mistake, or deception of purchasers. Both courts decided there was no infringement of plaintiff's trade-mark or rights.

This limitation upon the doctrine of secondary meaning was early recognized by the Sixth Circuit Court of Appeals. Judge Denison speaking for the court in G. & C. Merriam Co. v. Saalfield, supra, said:

"The alleged trespassing defendant has the right to use the word, because in its primary sense or original sense the word is descriptive; but, owing to the fact that the word has come to mean, to a part of the public, something else, it follows that when the defendant approaches *that same part of the public* with the bare word, and with nothing else, applied to his goods, he deceives that part of the public, and hence he is required to accompany his use of the

bare word with sufficient distinguishing marks normally to prevent the otherwise normally resulting fraud." Page 373 of 198 F. (Emphasis supplied.)

Other courts have recognized the same limitations on otherwise weak marks which have acquired secondary meaning. The District Court in New Hampshire phrased it this way:

"The secondary meaning of a name, however, has no legal significance, unless the *two parties make or deal in the same kind of goods.*" Western Auto Supply Co. v. Western Auto Supply Co., (D.C.N.H., 1936), 13 F.Supp. 525, at page 527. (Emphasis supplied.)

■ From a reading of the cases in this area of the law, it is patent that the protection afforded a mark by virtue of the "secondary meaning" doctrine is limited. This limitation is variously described, but it can be stated simply as restricting the protection afforded by the doctrine to goods of the same, or a closely related class, in the same general consumer market.

In the present case, however, plaintiff seeks a virtual monopoly of the name "Cadillac." This objective is evidenced by its attempt, successful in many instances, to dissuade other established businesses from using the name "Cadillac."⁹

Plaintiff contends that the fame of the explorer, Antoine de Mothe Cadillac, and the renown of the City of Cadillac, Michigan, Lake Cadillac, and the use by others of the name "Cadillac," over the years, have been inundated by plaintiff's advertising so that the accumulated consequential force which the secondary mean-

---

9. Plaintiff's Exhibit 115 lists 132 attempts by plaintiff since November 19, 1951, to the date of the trial in which it has in many instances successfully protested by letter the use of the name "Cadillac" by others.
Plaintiff's Exhibit 116 lists twelve protests by Cadillac as litigated. It is interesting to note what Mr. Murphy reported as the result in each of these cases. (Tr.

279–85.) Four of the matters were resolved by consent decrees in favor of the plaintiff. Five were oppositions sustained by the Patent Office in favor of the plaintiff. One was a summary proceeding in favor of the plaintiff by a New York state court. Of the remaining two, one was in progress at the time of this trial, and of the other Mr. Murphy had no knowledge.

ing gave to plaintiff's trade-mark now supersedes all else.

Plaintiff attempts to enlarge the secondary meaning doctrine so as not only to transform a weak historical and geographical mark into a strong mark, but to extend the doctrine to the degree of converting a limited monopoly for use in the automotive field to a total monopoly in the use of the name "Cadillac."

Plaintiff claims, in effect, that its secondary meaning in the trade-mark "Cadillac" is so strong that no one may use it in any field; this is due to plaintiff's theory that public confusion automatically follows the use of the trade-mark "Cadillac" upon any other product, no matter how unrelated it may be to Cadillac automobiles.

If this Court decided in favor of plaintiff's theory, plaintiff hereafter would never have to establish its "Cadillac" trade-mark in any given field where plaintiff sought redress against an alleged infringement. Plaintiff simply would be required, under such a holding, to demonstrate the inordinate strength of its trade-mark "Cadillac" in the automotive field.

Thus, in effect, this would establish plaintiff's mark in all fields as to all products, and it would neatly sidestep the limitation on the doctrine of secondary meaning which restricts a limited trade-mark to goods which are of "substantially of the same descriptive properties as those set forth in such registration," or use of which "is likely to cause confusion or mistake or to deceive purchasers as to the source of origin." S. C. Johnson & Son, Inc. v. Johnson (CCA 2), 175 F.2d 176.

Plaintiff's purpose is obvious when we review the testimony of Patrick Henry Murphy, Esquire, an attorney for General Motors. He testified to examples of uses of "Cadillac" as a trade-mark by others, which moved plaintiff to send letters to purported infringers. The products objected to included such diverse items as Go-Karts (Tr. Page 278); key rings (Tr. Page 276); dog food (Tr. Page 270); toy cars (Tr. Page 265); water softeners (Tr. Page 281); and jewelry (Tr. Page 256–7). See footnote 9, page 726.

Plaintiff asks this court to extend the secondary meaning doctrine far beyond any previously constituted legal concept —to a total monopoly.

Such a conclusion would bestow upon a mark which has its only claim to exclusive use arising under the secondary meaning doctrine, an amount of strength far surpassing that afforded to fanciful and aribitrary words. This simply would be an unconscionable encroachment upon public and private rights.

Plaintiff's claims of rights in this case cover too broad an area. While recognizing the vast holdings and varied products of the plaintiff, this Court must also be correspondingly cognizant of the tendency such concentrated power may have toward illegal or oppressive monopolies. This case is a classical example of a monopoly force begetting further monopoly.

In the case of California Fruit Growers Exchange v. Sunkist Baking Co., (CCA 7, 1947) 166 F.2d 971, at 973–974, the court found:

"Unless 'Sunkist' covers everything edible under the sun, we cannot believe that anyone whose I.Q. is high enough to be regarded by the law would ever be confused or would be likely to be confused in the purchase of a loaf of bread branded as 'Sunkist' because someone else sold fruits and vegetables under that name. The purchaser is buying bread, not a name. If the plaintiffs sold bread under the name 'Sunkist,' that would present a different question; but the plaintiffs do not, and there is no finding that the plaintiffs ever applied the word 'Sunkist' to bakery products.

*"The unconscionable efforts of the plaintiffs to monopolize the food market by the monopoly of the word 'Sunkist' on all manner of goods sold in the usual food stores should not be sanctioned by the courts. The trade-*

*marks should be confined substantially to the articles for which they were authorized, otherwise, why limit the marks at all?"* (Emphasis supplied.)

No one whose "I.Q. is high enough to be regarded by the law would be likely to be confused" in the purchase of a boat of the defendant branded "Cadillac" because General Motors sold automobiles under the same name.

Certainly, granting plaintiff the holding it seeks in this case would extend the legal monopoly of the registered trade-mark far beyond that which General Motors is entitled to under the Lanham Act, or under common law.

This court finds as a matter of fact and of law that General Motors' claim to the name "Cadillac" to the exclusion of practically all others extends beyond that which is its due under the law, in justice, or in equity and good conscience.

This court relies very strongly throughout this opinion upon the Johnson cases, the decision of Judge Learned Hand in the case of S. C. Johnson & Son, Inc. v. Johnson (CCA 2), supra, and the opinion of Judge Thomas F. McAllister in the case of S. C. Johnson & Son, Inc. v. Johnson, (CCA 6, 1959) 266 F.2d 129.

Title 15 U.S.C. § 1051 et seq., the Lanham Act, provides that an owner must file a written, verified application in the Patent Office, in which he must specify the mark and the goods on which the mark is to be used, as well as the mode and manner in which the mark is to be used in connection with the goods. All of these requirements must be met in order to secure a registered trade-mark under the Lanham Act.

Subsequently, Title 15 U.S.C. § 1057 orders that the Patent Office must state on the certificate of registration the particular goods for which it is being registered.

This statutory mandate is not an empty formality. The limitation of the application is a factor to be considered in trade-mark infringement litigation. Judge Thomas F. McAllister in S. C. Johnson & Son, Inc. v. Johnson (CCA 6), supra, 266 F.2d at pages 136–137, quoted with approval from the case of California Fruit Growers Exchange v. Sunkist Baking Co., supra:

"The trade-marks should be confined substantially to the articles for which they were authorized, otherwise, why limit the marks at all? Before a trade-mark can be granted under the applicable Lanham Act, the application therefor must name the products to which it is to apply."

In the Johnson case (CCA 2), supra, 175 F.2d pages 178, 179 and 180, Judge Learned Hand explained why the trade-mark act was amended in 1905 and 1946.[10] He commented:

"The law of trade-marks, which is in any event only a part of the law of unfair competition, was originally designed to protect the mark's owner from the diversion of customers who would otherwise have bought of him."

By 1905 the trade-mark law had been extended to cover goods on which the owner had never used the mark.

Judge Hand then discussed decided cases before 1905 in which the Federal Courts had extended the doctrine to cover such goods, and made the following pertinent comment in the Johnson case (CCA 2), supra:

"It will be observed that in all these cases the *sales held to infringe were of goods which were 'substantially of the same descriptive properties as those set forth in the registration'; and that on the occasion when that was not true, the owner*

---

10. The trade-mark act was amended in 1905 and 1946. The 1905 amendment provided for limiting infringing sales to those of goods which were of "substantially the same descriptive properties" as those set forth in such registration. The 1946 amendment to the trade-mark act substituted all goods "likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods or services." 15 U.S.C.A. § 1114.

*of the mark failed."* (175 F.2d page 179.) (Emphasis supplied.)

It is a reasonable inference according to Judge Hand, that the 1905 language of the Act, supra, intended "rights" thus conferred would be co-extensive with those recognized by then prevailing law of unfair competition. He further found that after the 1905 amendment the Circuit Court of Appeals for the Second Circuit extended the trade-mark act's umbrella of protection in the case of Aunt Jemima Mills Co. v. Rigney & Co., (CCA 2, 1917) 247 F. 407, L.R.A.1918C, 1039.

Judge Hand concluded (in the Johnson case, supra) that in the Lanham Act, *Congress wished to do no more than clear up the doubt which had arisen by reason of decided cases, such as Aunt Jemima, apparently extending the doctrine of the 1905 Act's protection, so as to make the protection of the new right, under the Act of 1946, co-extensive with the law of unfair competition as it was in 1946.*

"Besides, not only is this a sufficient reason for the change, *but there is the strongest possible reason for not reading the language literally, because to do so would frequently result in a great hardship to others, and give to the first user of a mark a wholly unjustified power to preempt new markets."* (Emphasis supplied.)[11]

The change of language in the Lanham Act leads the court directly to the question of whether it totally abolished the previous criterion, that infringement may only occur where the competing goods are "substantially of the same descriptive properties as those set forth in such registration." Or, phrased another way, is the fact that a product is likely to cause confusion, or mistake, or to deceive purchasers as to the source of origin of such goods and services, as provided by the Lanham Act, alone enough to sustain an action by the owner of a mark?

As Judge Learned Hand held in the Johnson case (CCA 2), supra, 175 F.2d at page 180:

"[It] is far from true that the mere fact of confusion between the two users should always and of itself tip the scales in favor of the first. (Citations omitted.) [We] tried to show how the power of a first user to establish such a premonitory lien upon a future market might lead to great injustice. In deciding such *'interstitial'* issues, which legislatures at times wisely leave to them, courts are obliged to take over their function pro hac vice and to decide which of the conflicting interests they think should prevail." (Emphasis supplied.)

In 1962, Section 1114 of the Trade-Mark Act was again amended.[12]

---

**11.** In the case of Metal Craft Co. v. Grand Rapids Metalcraft Corporation, 255 Mich. 638, 239 N.W. 363, Judge North of the Michigan Supreme Court stated:
"From the facts disclosed by this record as above noted, *there is in reality no competition either fair or unfair between these parties.* Neither of them is making or vending an article duplicated by the other. Neither can nor does substitute any one of its articles for a similar article of the other.
" '*Each case of unfair competition is determined upon its own facts, and relief is based upon principles of common business integrity.*
" 'Essential point of unfair competition is actual competition, shown from specific instances or as a natural tendency of defendant's act.' (Syllabi) Good

Housekeeping Shop v. Smitter, 254 Mich. 592, 236 N.W. 872." (Emphasis supplied.)

**12.** "Subsec. (1). Pub.L. 87–772 amended subsection generally, and among other changes, inserted 'distribution', and eliminated 'purchasers as to the source of origin of such goods or services' following 'or to deceive' in par. (a), inserted provisions regarding the likelihood of such use causing confusion, mistake, or deception, in par. (b), and eliminated the limitation on recovery under subsec. (b) of this section, to acts committed with knowledge that such acts would deceive purchasers." Historical Note (1962 amendment), Title 15 U.S.C.A. § 1114, Page 180.

Likewise, Congress did not intend the 1962 amendment to eliminate defendant's use of the name "Cadillac" for the reasons hereinbefore and hereinafter stated. Congress could not have intended to grant any owner of a geographical trademark, which has acquired secondary meaning, the right to a total monopoly.

As late as April 1946, it was doubtful whether a geographical name in common use could be registered as a trade-mark. See Application of Westgate Sea Products Co., (April 1, 1946) 154 F.2d 1010, 33 CCPA 1258; In re Canada Dry Ginger Ale, Inc., (CCPA, December 21, 1936) 86 F.2d 830, which reviewed and rejected the In re Plymouth Motor Corporation doctrine (CCPA, January 12, 1931), 46 F.2d 211.

The conflicting interests between users of a geographical, historical or a family name, or otherwise weak marks, must be decided *pro hac vice* or *ad hoc* by weighing the equities in each case.

If Congress intended to clothe weak trade-marks with the strength of arbitrary, fanciful marks, it could have expressed itself in plain, simple language to that end.

The first use of a trade-mark of a specific common name does not, by and of itself, give the first user the right to prevent a subsequent "fair use" of the identical name by others on different articles. Richfield Oil Corp. v. Dieterich Field, Inc., (C.C.P.A., 1960) 279 F.2d 885, 886. The issue was properly presented in the case of the Federal Tele-

phone & Radio Corp. v. Federal Television Corp., (CCA 2, 1950) 180 F.2d 250, where Judge Learned Hand stated at Page 251:

"Although there appears to be a persistent belief that the first use of a specific name or description gives a power to the first user to prevent its use by others, it is important to remember that no such doctrine exists. In all such cases there is only one question: *what damage to the first user will the second do by the use of the first user's mark, or name or make-up, and what burden will it impose upon the second user effectively to distinguish the goods?*

"*It is enough to dispose of the case at bar that the plaintiff failed to show that either of the two interests which we have just mentioned will be endangered by defendant's use of the word.* 'Federal.' " (Emphasis supplied.)

Plaintiff here sustained no damage, loss of sales, profit, prestige, or injury to its good will; its name or reputation was not tarnished in any way by activities of the defendant Cadillac Marine & Boat Co.

The testimony of Mr. Harold G. Warner, Vice President of General Motors and General Manager of Cadillac Division, and Mr. John A. Dunn, General Parts and Accessories Manager, Cadillac Motor Car Division, compels the court to reach this conclusion.[13]

---

13. Mr. Harold G. Warner, testified on Page 8 of his deposition taken February 12, 1963, as follows:
"Q. (By Mr. Heaney) Do you know of any sales of automobiles that Cadillac Motor Car Division has lost because of the name 'Cadillac' being on the boat?
"A. I do not because I am not in the sales department.
"Q. Do you know of any loss of profits that have been made by Cadillac Motor Car Division because of the use of the name Cadillac on boats manufactured and sold by the defendant Cadillac Marine & Boat Company?

"MR. HALLIDAY: This is objected to on the ground that it is incompetent and irrelevant and as a matter of law, not a condition precedent to the granting of relief to plaintiff. However, Mr. Warner, if you have any information, would you go ahead?
"A. I have no information.
"Q. (By Mr. Heaney) You don't know whether any profit has been lost or not; is that what you mean?
"A. That is right.
"Q. Has the price at which Cadillac Motor Car Division sold its automobiles been affected in any way by

Mr. Halliday, counsel for plaintiff, attempted to establish that the issue of loss of profits is irrelevant as a matter of law and not a condition precedent to the granting of relief to the plaintiff. However, it is an element to be considered by the court in determining whether the plaintiff has succeeded in establishing its case.

Judge Learned Hand in Federal Telephone and Radio Corp. v. Federal Television Corp., supra, 180 F.2d at page 251, teaches:

"As for retailers and their customers, it is conceivable that the word, 'Federal,' may lead them to believe that the defendant's television sets come from the plaintiff, and that, if the defendant's reputation becomes unsavory, the blame may be put on the plaintiff. However, there is so far no evidence of this, and we should have no warrant for depriving the defendant of whatever goodwill it has already acquired by its sales under its own name. It started the user in entire good faith, the word is in general use for all sorts of purposes, and the plaintiff's pretension to monopolize it is without any present basis that we can discover."

We have heretofore seen that the law of trade-marks was originally designed to protect the mark owner from the diversion of customers who otherwise would have purchased from him.

Judge Hand further found in the Johnson case (CCA 2), supra, that the "Aunt Jemima" doctrine recognized only two interests on which the owner can stand; "(1) the possibility that the trade practices of the second user may stain the owner's reputation in the minds of his customers; and (2) the possibility that some time in the future he may wish to extend his business into that market which the second user has begun to exploit."

Then, later, 175 F.2d at page 180:

"The plaintiff does not sell cleaning fluid; it makes waxes and other polishes, and the defendants cannot possibly turn away from it any customers who would buy these instead of cleaning fluids."

In the instant case, plaintiff does not sell boats such as those which are manufactured by the defendant, and defendant cannot possibly turn away from plaintiff any customers who would buy boats instead of Cadillac automobiles.

While competition is not *sine qua non* as dispositive of the issues involved in this case, it is an element, and an important element, together with the other elements considered by the court in determining whether or not there is in

the sale of boats with the name Cadillac on them, manufactured by defendant, Cadillac Marine & Boat Company?

"A. No."

Mr. John A. Dunn testified as follows, (Tr. 360–361):

"Q. (By Mr. Heaney) Mr. Dunn, do you know of any sales that Cadillac Division has lost on its motor cars because of the business of defendant Cadillac Marine & Boat Company?

"A. I do not.

"Q. Do you know of any loss of profits to General Motors because of the activities of Cadillac Marine & Boat Company?

"A. I do not.

"Q. Do you know of any loss of prestige or reputation of Cadillac automobiles because of the activities of Cadillac Marine & Boat Company?

"A. I do not.

"Q. And would you say that there has been any loss of sales, profit or prestige because of the activities of Cadillac Marine & Boat Company, the defendant?

\* \* \* \* \*

"A. You have got three items in there. Two of them I have answered. One I answered I knew nothing of loss of sales, nor do I know anything about a loss of profits. If you are asking me my opinion as to the loss of prestige—

"THE COURT: He asked you whether you had any knowledge of loss of prestige, not whether you had any opinion.

"THE WITNESS: I see. I have no knowledge of any loss of prestige."

fact a probability of confusion, insofar as the actual purchaser of either Cadillac automobiles or defendant's boats are concerned.[14]

This court now considers additional compelling evidence relevant to the important element of competition.

On April 25, 1956, plaintiff, through its Vice President, Charles A. Chayne, filed its sworn notice of opposition to defendant's application for a trade-mark.

This court finds that the plaintiff's allegations in its notice of opposition to defendant's trade-mark application, and the inferences which plaintiff intended should be drawn from the allegations, insofar as plaintiff's trade-mark relates to the boating industry are contrary to the facts and the findings of this court in this opinion.

This court particularly finds that plaintiff's allegation number 8, on page 2 of its notice of opposition, is untrue. Plaintiff there alleged:

"The goods on which applicant's mark is alleged to be applied and the goods on which opposer's said mark is applied, are of the *same descriptive properties*, and the origin of applicant's goods is likely to be confused with the origin of opposer's goods." (Emphasis supplied.)

■ Defendant's small boats and plaintiff's Cadillac automobiles and the parts or engines, are not "of the same descriptive properties."

Testimony during the trial by Mr. Dunn and Mr. Warner contradicts the sworn allegations of plaintiff's Vice President, Charles A. Chayne, in plaintiff's notice of opposition to defendant's trade-mark application. They both testified to the effect that plaintiff was not in the boat business.[15]

"Q. (By Mr. Heaney) Has Cadillac Division of General Motors ever sold boats under its name to the public?
"A. No, not to my knowledge.
 * * * * *
"Q. (By Mr. Heaney) Has Cadillac Division ever sold marine engines under its name?
"A. No.
"Q. Has Cadillac Division ever sold outboard motors for boats under its name?
"A. I would say no."
Again, Mr. Dunn testified at Page 359 of the transcript, as follows:
"Q. (By Mr. Heaney) Referring to plaintiff's Exhibit 7, the last two pages depicting Cadillac automobiles (this should be plaintiff's Exhibit 7B, pages 153 and 154), and the Cadillac boats which I have just shown you on plaintiff's Exhibit 106, * * * I ask you whether in your judgment there is any competition between Cadillac Motor Car Division and Ash-Craft or Cadillac Marine and Boat Company with respect to the sale of these two items?
"MR. HALLIDAY: If your Honor please, we object to this. It is incompetent, irrelevant and immaterial.
"THE COURT: The objection is overruled. The court finds that it is competent, relevant and material in the light of the decided cases, particularly in this circuit. (Fur-

14. Metal Craft Co. v. Grand Rapids Metalcraft Corporation, supra; 52 Am.Jur., Pages 566–7, Section 87, Grounds and Requisites of Liability and Relief.

15. Mr. Harold G. Warner testified in his deposition of February 13, 1963 (plaintiff's Exhibit 127, at page 11), as follows:
"Q. (By Mr. Heaney) Does the General Motors Division manufacture any marine engines or parts of marine engines—I meant the Cadillac Division * * *
"A. No, we do not.
"Q. (Page 20) Has a boat ever been sold that you know of with the name Cadillac on it by General Motors?
"A. Not that I know of.
"Q. General Motors has never been in the boat business has it, with the exception of the diesel marine engines that it makes and the government amphibious craft that is shown in Exhibit 108?
"A. I don't know from personal knowledge."
At the outset of the trial on the merits, Mr. Dunn, in answer to a question on direct examination concerning the business of Cadillac Division of General Motors, said:
"It manufactures automobiles and engines, parts, accessories, component parts for these items, as well as some military materials." (Trial Page 6.)
Later, on cross-examination, Mr. Dunn testified (Trial Page 348):

Mr. Chayne, on May 24, 1958, in answer to defendant's interrogatories identified John A. Dunn as an officer and employee of plaintiff who had knowledge of the facts alleged in the complaint or specified in preceding answers to the interrogatories and who could testify in regard to such facts.

Obviously, from the testimony of Mr. Dunn and Mr. Warner, defendant's boats are not in actual or substantive competition with any articles manufactured by plaintiff, especially its Cadillac Division.

While Cadillac cars and defendant's Cadillac boats are means for transportation, one on land and one in the water, they do not possess the same descriptive properties. They are substantially different. This differential makes them void of inherent confusing characteristics.

Both represent more than a casual investment; neither can be compared with Coca-Cola and Fletcher's Coca-Cola. Nashville Syrup Co. v. Coca-Cola (CCA 6, 1914), 215 F. 527. Nor can they be compared with creme de menthe and creme de menthe as in Societe Anonyme De La Grande etc. v. Julius Wile Sons & Co., (S.D.N.Y., 1958) 161 F.Supp. 545, a case in which Judge Irving R. Kaufman found no confusion and no infringement.

 While there is no fetish in the word "competition", Vogue Co. v. Thompson-Hudson Co., (CCA 6, 1924) 300 F. 509, at Page 512, there must be a reasonable probability of injury or unfairness to the plaintiff or the public as a result of confusion caused by defendant's action. This is a factor in determining unfair competition under the common or statutory law, in alleged infringements of

nished S. C. Johnson & Son, Inc. v. Johnson, (CCA 6, 1959) 266 F. 2d 129).

"MR. HALLIDAY: Would your Honor hear me a moment to explain our position? We do not object to counsel asking the question whether the likelihood of confusion would result. We merely point out to your Honor that it is not necessary that there be competition between the plaintiff and the defendant in order to obtain relief.

"THE COURT: In the decisions which I have read competition is one of the factors.

"MR. HALLIDAY: It is a factor, but not the sine qua non.

"THE COURT: Well, maybe not the sine qua non. *None of these individual items taken separately are sine qua non; they are all a part of the bundle of equities."* (Emphasis supplied.)

"The decisions, particularly from this circuit, speak of competition as a factor, and, therefore, it is relevant and material to the issues raised by the pleadings in this case. You may proceed, Mr. Heaney.

"A. (By Mr. Dunn) *I would say there is no competition between the two."* (Emphasis supplied.)

Also, Mr. Dunn in testimony admitted that none of the 7,000 parts of the Cadil-

lac automobile would be suitable for use on defendant's Cadillac boats (Tr. Page 358):

"Q. (By Mr. Heaney) On your direct testimony, Mr. Dunn, you referred to the fact that your dealers carry 7,000 parts for the repair and servicing of Cadillac automobiles, did you not?

"A. (By Mr. Dunn) A typical dealer would have that assortment. The assortment would vary according to the size of the dealerships.

"Q. And the exhibit of the plaintiff number 2A does contain a great number if not all of those parts, does it not?

"A. It contains a fraction of those parts. The book itself is as thick as a Sears Roebuck catalogue or thicker.

"Q. I show you defendant's Exhibit 106, a brochure of Ash-Craft, and call your attention to the Cadillac boat that is on the front page with the Evenrude motor on it, and four Cadillac boats on the back page, two with Evenrude motors and two with Johnson motors, and ask you to exclude the consideration of the motors and ask you how many of the parts you have referred to, the 7000 parts of the Cadillac automobile, would be suitable for use on one of those Cadillac boats?

\* \* \* \* \*

"A. I wouldn't say any of them were."

weak trade-marks with acquired secondary meanings.

Plaintiff also has failed to establish a present intention either at the time of commencement of this action, or at the time of trial, to enter the market occupied by the defendant in its use of the name "Cadillac."

Plaintiff, as a further element of unfair competition, contends that defendant infringed plaintiff's trade-mark "Cadillac" by using the name to induce purchasers or prospective purchasers to believe that Cadillac Marine & Boat Co.'s goods originate from or in some way are connected with plaintiff.

To attempt to show that confusion would arise, and had in fact arisen, the plaintiff conducted a survey of some one hundred fifty individuals.[16]

The results were noted upon a sheet in the survey booklet by either the subject or interviewer and later tabulated. The survey was conducted by two college students as part of their summer employment.

Upon trial, defendant raised several objections to admission of any of the survey evidence. One of the defendant's objections was that the survey constituted hearsay, and as such is inadmissible.

■ Historically, this was once an adequate ground upon which to base an objection. (See Elgin National Watch Co. v. Elgin Clock Co., (D.C.Del., 1928) 26 F.2d 376, for this view.) The Federal

Courts, however, in a series of similar cases leading from United States v. 88 cases, more or less, containing Bireley's Orange Beverage, (CCA 3, 1951) 187 F. 2d 967, have granted a "ticket of admission" to evidence presented by surveys despite its hearsay character.

■ The defendant in this case also objected that the survey was taken by untrained people, and that it is irrelevant. Initially, however, it must be stated that such objections go only to the weight, rather than to the admissibility of the evidence. As the court stated in the 1953 case of Rhodes Pharmacal Co. v. Federal Trade Commission, (CCA 7, 1953) 208 F.2d 382, at Page 386:

"Theoretically a sound method of ascertaining the meaning of petitioners' advertisements to the consuming public would be to interview potential customers and ascertain what those ads meant to them. A survey of the attitude of dentists toward a drug preparation was considered by the court in Bristol-Myers Co. v. Federal Trade Commission, 4 Cir., 185 F.2d 58, 60. The government offered a survey of consumer reaction in United States v. 88 Cases, More or Less, Containing Bireley's, etc., 3 Cir., 187 F.2d 967, 974. The testimony of witnesses drawn from the general public, as to the impressions made upon their minds upon reading the advertisements, was admissible. This procedure of inves-

---

16. The survey consisted of showing the person being polled a copy of an advertisement for Cadillac boats and then asking him two questions: (1) Who do you think puts out the boats shown on the opposite page; and (2) Will you please name anything else that you think is put out by the same concern?

The advertisement itself consisted of a photostatic copy approximately 7″ x 4¾″. The right half of the page consisted of a column of three photographs of Cadillac boats. The upper one-third of the left half consisted of the word "Cadillac" written in white in large flowing script on a black background, accompanied by the words, "trim, tough and terrific", in smaller print.

Again in the lower left hand corner, the same technique was used to exhibit the word "Cadillac" on a space of a size approximating ¾″ x 1¾″. Here the script was accompanied by the words, "Sweetest boat afloat," in smaller print. In small print at the bottom of the advertisement was noted, "Cadillac Marine & Boat Company," followed by slightly smaller sized words reading, "406 Seventh Street, Cadillac, Michigan."

The remainder of the space was occupied with textual material, supplying specifications and extolling the features of a Cadillac boat. An invitation was also included to write for free literature on the Cadillac boat line.

tigation has received the sanction of the courts. Gulf Oil Corp. v. Federal Trade Commission, 5 Cir., 150 F.2d 106, 108; Stanley Laboratories, Inc., v. Federal Trade Commission, 9 Cir., 138 F.2d 388, 391; Ford Motor Co. v. Federal Trade Commission, 6 Cir., 120 F.2d 175, 182.

"Obviously the value of a survey depends upon the manner in which it was conducted—whether the techniques used were slanted or fair. * * * "

The entire problem is placed in proper perspective by the case of Standard Oil Co. v. Standard Oil Co., (CCA 10, 1958) 252 F.2d 65, 76 A.L.R.2d 600. In that case, 252 F.2d at Page 75, the court had the following to say:

"The results of a public recognition survey may properly be received to establish whether trade symbols in question have achieved a degree of public recognition that constitutes secondary meaning and as to whether there is confusing similarity in designations.

"The admissibility of the survey evidence is attacked on the ground of hearsay. The persons who conducted the surveys were called as witnesses. Of the persons interviewed, forty-five testified at the trial or by way of deposition. The hearsay objection is not well taken. The persons who did the interviewing testified as to the results of their surveys. Their testimony was offered solely to show what they found. Only the credibility of the persons who took the statements was involved and they were before the court. The technical adequacy of the surveys was a matter of the weight to be attached to them. Elaborate evidence was received from the defense on this point." (Footnotes omitted.)

The parallel is obvious between the Standard Oil case and the case before this court. Here, as in Standard Oil, there was full testimony taken by deposition from those persons who conducted the survey for the plaintiffs. There was also testimony taken by deposition of a number of the persons among whom the survey had been conducted. Therefore, the final and only question as to the survey in this case is as to what weight should be given to the evidence thus presented by plaintiff General Motors.

In attempting to define the probative value of the poll, the first consideration must be directed toward the nature of the two questions which made up the poll.

The initial question of the survey is, indeed, as defendant contended upon the trial, productive of unclear or ambiguous answers. One need only leaf through the survey booklets [17] to see an obvious lack of clarity in the responses.

There are many instances where the answer to the first question is clearly a hazy, qualified one.

Mr. Gale Robinson, in answer to the question, "Who do you think puts out the boat shown on the opposite pages?", replied, "It says Cadillac on it."

In response to the same question, the next subject replied, "It says Cadillac." [18]

Certainly the advertisement says "Cadillac." But, Query: is such a statement an answer to the question of who the subject thinks put out the boat?

An even better example of the lack of clear results to the question posed is the answer of Mrs. Phyllis Pelikan [19] who responded, "Well, since it says 'Cadillac,' I guess it's Cadillac."

The answer to the question is "Cadillac"; that is, after all, what the advertisement says, but it seems apparent that such qualified answers are not susceptible to a categorization such as plaintiff attempted in summarizing the poll.

17. Plaintiff's Exhibits 47–52.

18. Plaintiff's Exhibit 47, at Pages 20 and 21.

19. Plaintiff's Exhibit 48, at Page 2.

In fact, there is no clear way to determine what the subjects meant by such answers to the first question; nor does question two abate the confusion. This second question, "Will you please name anything else you think is put out by the same concern?", is a classic example of a leading question.

If there was any doubt in an individual's mind as to whether the "Cadillac" he named in response to the first query was the General Motors Cadillac, the second question would very likely be enough to remove that doubt. The question directed an opinion to those who had formed none on the first inquiry.

To demonstrate the propensity of the question to lead, an examination of the survey booklets provides many instances where a person who drew a complete blank on the initial question was suddenly reminded of cars and General Motors by the way in which the second question is phrased. This reminder was the product, not of the advertisement, but of the second question itself.

One individual [20] said, "I have no idea," in answer to the first question, yet the second question brought the answer, "car."

Mrs. Seewagen [21] answered as to who she thought manufactured the boats shown, "I don't know, I don't know anything about boats." However, when asked about anything else produced by the firm she could not seconds before identify, her reply was, "car."

Mr. Cisik [22] was led even further. After answering that he did not know in response to the first query; he answered the second by saying, "caskets and cars."

There are many other examples of the same nature contained within the plaintiff's exhibits.[23]

Moreover, the tabulations of the survey shown on the inner pages of the survey booklets and the over-all tabulations submitted by the plaintiff [24] are neither accurate nor truly reflective.

To begin with, the second category of answers which is noted on the tabulation sheets is unclear, because it is too broad. This second category totals the number of individuals who mentioned "Cadillac (identified with automobile), General Motors, or equivalent of maker of the cars, motors, engines, or marine engines," in response to the first question. The opposing, or other category, (besides miscellaneous answers and "I don't know") was one which called for those answers which mentioned "Cadillac Marine & Boat Co., Cadillac, Marine or Cadillac boats."

Under these tabulations anyone who merely gave the advertisement a cursory glance would note "Cadillac" as his answer to the survey's first question. This, after all, was the boldfaced, large script which heads the advertisement. Such an answer, however, does not necessarily reflect the confusion which plaintiff contends consequently arose between Cadillac Division of General Motors and Cadillac Marine & Boat Co. Nor does the tabulation take into consideration the hazy and qualified answers to the first question which have been previously discussed. Instead, these answers were lumped into a category with those which had mentioned General Motors as an equivalent manufacturer.

Indeed, in going over the survey booklets, this court finds there were only some thirty-three individuals who, from a reading of both answers to the survey, obviously had confused the two companies as being one and the same.[25]

---

20. Plaintiff's Exhibit 47, at Page 6.

21. Plaintiff's Exhibit 47, at Page 13.

22. Plaintiff's Exhibit 52, at Page 12.

23. Plaintiff's Exhibits: 47, at Pages 7 and 13; 48, at Pages 2, 4, 12 and 15; 49, at Pages 13, 14 and 21; 50, at Pages 13 and 15; 52, at Pages 10, 12, 15, 16, 19, 20, 21, 23 and 24.

24. Plaintiff's Exhibits 55, 56 and 57.

25. Plaintiff's Exhibit 47, Pages 4, 5, 6, 7, 12, 13, 20, 21 and 23; plaintiff's Exhibit 48, pages 2, 12, 15 and 17; plaintiff's Exhibit 49, pages 1, 3, 5, 7, 9, 10, 13, 14 and 15; plaintiff's Exhibit 50, pages 6, 7, 17 and 25; plaintiff's Exhibit 51, pages 2, 11 and 19; plaintiff's Exhibit 52, pages 10, 13 and 15.

It is also important to note that many of the individuals the court has included in the total of thirty-three were apparently confused only because of the leading character of the second survey question.

The fact that the tabulations were not carefully considered is further pointed out in plaintiff's Exhibit 52A, which is the tabulation page of one of the survey booklets. Here, Page 8 is included in the category of those who answered "Cadillac" to Question one, who also went on to answer, "cars" or "automobiles" to Question two. An examination of the page referred to discloses that what the individual in reality said was, "It's *not* General Motors, the car." (Emphasis supplied.)

There are also some key problems which arise due to the way in which the poll was conceived and conducted.

In the first place, it is difficult to envision one hundred fifty persons in a single geographical area as an adequate sampling of the United States consumer market for any product, let alone products of such a wide market range as automobiles and boats.

Secondly, the type of persons apparently does not represent either a good cross section, nor the correct segment of the public. The correct segment of the public is the likely purchaser or purchasers. This was pointed out in the case of S. C. Johnson & Son, Inc. v. Johnson, (CCA 6, 1959) 266 F.2d 129, at page 138, where Judge McAllister said that the trial court had found the use of the name Johnson on a product:

> " * * * was a use 'likely to cause confusion or mistake or to deceive *purchasers* as to the source of origin of such goods and services.' The crucial determination of the trial court was its finding that appellees' use of the name did not cause, and was not likely to cause confusion or mistake or to deceive *purchasers*

as to the origin of their goods." (Emphasis supplied.)

 The individuals among whom this poll was taken were not, in the vast majority of cases, "purchasers" in any sense of the word. Indeed many indicated they had no interest in boats at all.[26]

Of necessity, it then follows that their inspection of the proffered advertisement was casual, cursory and careless. The best example of this comes in the testimony of Mr. McLoone, who on cross-examination by defendant's attorney admitted, "I just looked at the pictures and bold print."[27]

That this goes to the question of the weight and sufficiency of the poll in evidence is well illustrated in the case of Oneida, Ltd. v. National Silver Co., Sup., 25 N.Y.S.2d 271, at Page 286, where the court, in commenting on a poll taken in a similar case, said:

> "The weight and sufficiency of this evidence is another question. * * * The inspection must have been in the main casual, *and not with that degree of attention that would be given in the case of an ordinary purchase. * * ** The results * * * were * * * in my opinion, inconclusive; and I do not attach weight to this part of the evidence." (Emphasis supplied.)

A further connected problem is inherent with the material used to conduct the poll. Actual purchasers of a boat would not hastily read an advertisement, nor would a potential purchaser read it carelessly. A reasonable man, anticipating the purchase of a boat, would peruse the material at least well enough to note the manufacturer as being "Cadillac Marine & Boat Company, 406 Seventh Street, Cadillac, Michigan." Also, most buyers would want to see the boat itself before making a purchase.

The question may fairly be asked, what is a proper way to conduct such a survey?

---

26. Plaintiff's Exhibit 123, pages 54, 68, 74, 92, 106, 119 and 164.

27. Plaintiff's Exhibit 123, page 150; to the same effect, see also plaintiff's Exhibit 123, pages 145 and 205.

Perhaps the query might best be answered by quoting Judge Kennedy in Standard Oil Co. v. Standard Oil Co., 141 F.Supp. 876 (D.C.Wyo., 1956) where he said:

"We know of no fixed formula which has been generally recognized as a standard for conducting surveys in an attempt to ascertain public opinion. It has been quite generally used in the political field through what is known as the 'Gallup' polls and by what is called scientific polling of public opinion. There is no sufficient ground, however, to say that one system of polling in a particular field would be as effective as some other method in a different field." (At Page 887, of 141 F.Supp.)

In essence then, there appears to be no formula, other than a look at all the factors involved, by which to determine the sufficiency and worth of a poll such as the one presented in the case at bar.

By way of comparison, it is interesting to note the degree of care which the defendants exhibited in conducting a public survey in the case of People v. Franklin Natl. Bank of Franklin Square, 200 Misc. 557, 105 N.Y.S.2d 81.

In that case the preparation of the poll was assigned to the Department of Psychology of Hofstra College and set up under the guidance of the chairman of that department, a professor of psychology named Matthew Chappell. Professor Chappell "worked continuously on the task from beginning to end." He had extensive experience in the field of "public opinion and mass buying behavior," and was apparently an accepted expert in the field.

It should also be noted that Professor Chappell did not know the purpose of the poll he set up. A careful control of all factors was maintained. Compilations were carefully scrutinized and well broken down. Professor Chappell was called as a witness and testified extensively on the preparation of and the results of the poll.

The court then made the following statement in considering the poll as evidence:

"A party endeavoring to establish the public state of mind on a subject, which state of mind cannot be proved except by calling as witnesses so many of the public as to render the task impracticable, should be allowed to offer evidence concerning a poll which the party maintains reveals that state of mind. The evidence offered should include calling the planners, supervisors and workers (or some of them) as witnesses so that the Court may see and hear them; they should be ready to give a complete exposition of the poll and even its results; the work sheets, reports, surveys and all documents used in or prepared during the poll taking and those showing its results should be offered in evidence, although the Court may desire to draw its own conclusions. * * *"

In the present case, no testimony as to the preparation of the survey was produced. There are many signs that the survey was a great deal less than scientifically prepared.

The court has examined each page and each question and answer of the survey, as well as summaries and categorizations of the survey. There are errors in the categorizations. Most of the answers are indefinite; all of them evidence little care or consideration.

The survey is inconclusive and it falls far short of evidence of sufficient probative value to rise to the dignity of preponderating evidence.

In addition, plaintiff offered testimony of certain purchasers of the defendant's boats in an attempt to demonstrate a public and a purchaser confusion as to the source of defendant's boats.

Plaintiff's witness, Earl Fox, testified that a friend at his place of employment told him a Cadillac boat would be a good one for Fox's Oliver motor. "I took the boat out and tried it. I like it and that is

the reason I bought it."[28] Then, in response to the question, "So you bought your boat and sold it and used it for two years without knowing who made it, is that correct?" he answered, "The only thing I was interested in was performance of the boat itself." "It never occurred to me."

The other witness called by plaintiff upon trial to demonstrate confusion was a Mr. Alger Keller. It was his testimony that his first interest in a Cadillac boat arose as a result of a fishing trip when he discovered "four or five of us" couldn't tip it over.[29] It was this feature which prompted Mr. Keller to purchase a Cadillac boat.[30]

Nor does the testimony by deposition of the Minnesota buyers vary the impression of a lack of concern about the origin of the boats. Mr. Emerson purchased a Cadillac boat because "I like the way it went through the water and the way it looked." [31] Mr. Trummer bought because his grandson had picked out a Cadillac boat.[32]

Mr. Belay bought because a friend owned one and, "I like it real well. He recommended it." [33]

Mr. Oja made the selection of a Cadillac boat because the specifications were what he was looking for. Besides, "It really is a good product," and it didn't make any difference who made it.[34]

Mr. Royce stated that "it was the appearance of the boat that sold me mostly at that time." [35]

Mr. Thurmann chose a Cadillac boat because it was a safe boat, deep and wide.[36]

Mr. Carroll did his buying because he got the best deal on it.[37]

Only Mr. Couette categorically stated that it was the "name, I believe, more than anything else" which led him to purchase a Cadillac boat.[38] But it is apparent that even this testimony should be afforded limited weight because of the circumstances surrounding his purchase.[39]

None of the plaintiff's witnesses who are alleged to be purchasers of any boats from the defendant were in any way dissatisfied with their purchase. All of them purchased defendant's boats either on the recommendation of others, or by reason of some virtuous characteristic of the defendant's boat itself, or by reason of the specific recommendations of grandchildren.

Defendant's boats were of high quality; its reputation as a boat builder was excellent and outstanding; and, if Cadillac is synonymous with excellence, it is readily apparent from the testimony that defendant's boats proved to be equal to the qualifications of excellence.

Confusion in the minds of a careless purchaser is not dispositive of the issues in this case. The average person as a purchaser of either defendant's Cadillac boats or plaintiff's Cadillac automobiles is sufficiently sophisticated to be persuaded principally by the quality of the product and its intended use rather than the source of supply. This is evident by the testimony of plaintiff's witnesses. They did not actually become concerned about the source of origin until they were interviewed by plaintiff's agents or attorneys. Confusion, if any, arose in their minds at that time.[40]

28. Transcript, page 61.

29. Transcript, page 70.

30. Transcript, page 77.

31. Plaintiff's Exhibit 125, page 10.

32. Plaintiff's Exhibit 125, pages, 29, 30.

33. Plaintiff's Exhibit 126, page 6.

34. Plaintiff's Exhibit 126, page 24.

35. Plaintiff's Exhibit 125, page 42.

36. Plaintiff's Exhibit 125, page 59.

37. Plaintiff's Exhibit 125, pages 91 and 93.

38. Plaintiff's Exhibit 125, page 69.

39. Plaintiff's Exhibit 125, page 74.

40. Plaintiff's attorneys or agents went in pairs when they called upon unsuspecting prospective witnesses. They had considerable conversation with these witnesses before the witnesses knew the purpose of the

Judge Worley, in the case of Kiekhaefer Corp. v. Willys-Overland Motor, 236 F.2d 423, page 427, 43 CCPA 1013 (1956), observed:

"It is to be noted, in the first place, that the goods involved are comparatively expensive and are not ordinarily purchased casually, but only after rather careful consideration. In such cases confusion is less likely than where the goods are cheap and are purchased casually."

The Kiekhaefer case involved infringement claims between an outboard motor and an internal combustion engine. It is interesting to note that the court there held the two were not so related that the concurrent use of the trade-mark "Hurricane" on them by different manufacturers would be likely to result in confusion or mistake, or to deceive purchasers.

Plaintiff urges its vast and variegated products are factors to consider on the issue of confusion. The case of Sunbeam Lighting Co. v. Sunbeam Corp., (CCA 9, 1950) 183 F.2d 969, is in point. In that case the Sunbeam Corporation, a manufacturer of a great variety of electrical appliances with an esteemed national reputation sought to enjoin defendant's use of the trade-mark "Sunbeam" on fluorescent lighting fixtures. The court, 183 F.2d on page 972, remarked:

"If plaintiff's goods are so good that the mere mention of their trade-name or mark would be sufficient for a reasonable person to select an article bearing it, no matter how unrelated plaintiff's goods are to the article, then, as it seems to us, plaintiff must suffer the price of virtue."

And, again 183 F.2d at Page 973:

"Realizing the continuously expanding use of electrically operated conveniences in the progress of the civilized world, it seems quite unreasonable to hold that the plaintiff company with its well-earned reputation for quality in its line should have a legally enforceable monopoly to this superlative term throughout the whole electrical world."

Neither does it seem to this court that the plaintiff, General Motors, should have a legally enforceable monopoly on the historical term "Cadillac" throughout the business world.

As Judge Learned Hand observed in the Johnson case (CCA 2), supra:

"We cannot conceive any justification in these circumstances for al-

---

visit. For example, Russell W. Couette, of Maple Lake, Minnesota, on cross-examination, testified in answer to a question by Mr. Root (Plaintiff's Exhibit 125, at Page 78):

"Q. Well, do you recall about what that conversation was, what he said, or what you said?

* * * * *

"A. He wanted to know if I had a Cadillac boat, and I told him 'yes.' And I don't recall too much more about it because as I said before, I didn't know who he worked for or had no idea why he was, . . . he told me not why he was there, and I didn't ask him, although I will admit after he was there for a short time that I got to wondering what . . . what he was leading up to. But we talked for quite a while before . . . a long time. I would say it was a long time for me to have someone . . . stranger . . .

come in the house and talk to me without finding out just exactly what he wanted. But he was very, very nice.

* * * * *

"Q. And then before he left, did he identify himself, as to tell you why he was there?

"A. It seemed to me I had to kind of pry it out of him after while. I got to asking him questions towards the end, and that is the only way I found out anything about what was going on. And then he told me, and at the time I thought very little of it. I thought it was just a . . . I couldn't foresee anything like this. I was just asking . . . answering a few questions."

The nature of plaintiff's questions on direct examination of its witnesses who had purchased Cadillac boats in many respects were suggestive and leading.

lowing it (S. C. Johnson & Son, Inc.) to reach a choking hand into a market not its own, and to deprive the defendants of an interest, natural and proper in its origin, * * *.

"If Congress really meant to allow every first user of a mark so to stifle all excursions into adjacent markets upon showing no more than that confusion would result, it seems to us that it would have said no more clearly. In the case of fabricated marks which have no significance, save as they denote a single source or origin of the goods to which they are attached, the first user's right may indeed go so far. The second user can then show no interest of his own; and if, as will then appear, his only purpose is to trade on the first user's good-will, it is indeed time to intervene." 175 F.2d Page 180.

The defendant in this case has a substantial interest, both historical and geographical, in the name "Cadillac." Lake Cadillac and the near-by lakes and streams surrounding the City of Cadillac, Michigan, are motivating factors for naming boats Cadillac, which were originally manufactured in that area. Plaintiff should not be allowed to deprive this defendant of an interest, natural and proper, to its origin.

Cases cited by the plaintiff and upon which it principally relies, involve either strong or fanciful fabricated marks or the goods involved were "substantially of the same descriptive properties."

Four example, the case of Fleischmann Distilling Corp. v. Maier Brewing Co. (CCA 9, 1963), 314 F.2d 149, involved scotch whiskey and beer; Standard Brands v. Smidler (CCA 2, 1945) 151 F.2d 34, involved vitamin tablets and vegetable juices; O. M. Scott & Sons Company v. Surowitz (E.D.Mich., 1962), 209 F.Supp. 59, involved lawn and garden products; Hudson Motor Car Co. v. Hudson Tire Co., (D.C.N.J., 1927) 21 F.2d 453, involved automobiles and automobile tires.

Some of the cases upon which plaintiff also relies involved weak marks and plaintiffs in those cases could not give valid reasons for choosing the names in issue. None of the plaintiff's cases in its non-competition section deal with geographical marks.

All of the cases cited by the plaintiff in its section, "Actual Competition Is Not A Prerequisite To Relief," were decided before S. C. Johnson & Son, Inc. v. Johnson (CCA 2). Likewise, the cases cited in the section of plaintiff's brief entitled "Neither The Quality Of Defendant's Goods Nor The Fact That Plaintiff's Reputation Is Untarnished Is a Defense. Plaintiff Is Not Required To Commit Its Reputation To The Hands of Defendant," were decided before S. C. Johnson & Sons, Inc. v. Johnson (CCA 2), with the exception of Palmer v. Ford Motor Co., (E.D.Mich., 1963), 138 USPQ 479, and O. M. Scott & Sons Company v. Surowitz, supra.

In this day and age, when cities compete with cities for industries or a business enterprise, the name of the city, as well as the name of the product, are important public and private interests and an important asset to that city and its industries—its free enterprises. These important public and private rights would be in serious jeopardy, if plaintiff were to prevail in its overreaching demands.

This court was mindful of these important public and private rights when it asked plaintiff to produce copies of all its trade-marks, so that this court could determine the geographical names which General Motors has selected for trade-mark purposes. The plaintiff produced, at the court's request, copies of all its trade-marks in a document entitled, "U. S. Trade-mark Register of General Motors Corporation." (Not marked as an exhibit.)

General Motors should not be permitted to reach out its strong, choking, monopolistic hand to strangulate industries or free enterprises located within the City of Cadillac, Michigan. The City of

Pontiac, Michigan, the City of Euclid, Ohio, the communities of Seville in Florida, Georgia, Ohio or Spain, or the towns of LaSalle in Colorado and Illinois, and the village of LaSalle in France.[41]

At one point plaintiff's counsel urged that some of the people on Long Island had never heard of the City of Cadillac, Michigan.

"A geographical term remains such regardless of the extent to which it is known or unknown through the country." Callmann, Unfair Competition and Trade-Marks, Second Edition, Volume 3, Pages 1120–1.

In re Kraft-Phenix Cheese Corp., (1941) 120 F.2d 391, 28 CCPA 1153; Application of Westgate Sea Products Co., supra; In re McIlhenny v. Bulliard, (CC W.D.La.1920) 265 F. 705; and Trade-Mark Law and Practice, Lanham Act Edition, Leon Amdur, Clark-Borgman Co., Ltd. N. Y.

■ Defendant's use of the name "Cadillac" did not cause, and was not likely to cause, confusion or mistake, or to deceive purchasers as to the source of origin of their goods.

■ In using the name "Cadillac" defendant was guilty of no fraud or other improper practice, and, defendant made reasonable effort to identify, clearly, itself as manufacturer of its own product. See S. C. Johnson & Son, Inc. v. Johnson, supra, (CCA 6). It did not attempt to pawn its goods off as the goods of another.

■ Defendant did not infringe plaintiff's statutory or common law trade-mark; nor did the acts of defendant constitute unfair competition. Defendant acted in good faith, without fraudulent intent, either actual or constructive.

The question posed by the stipulation of the parties dated January 29, 1963, supra, (page 11), " * * * whether or not defendants shall be enjoined from the use of the word 'Cadillac' in any form or manner in connection with their goods," must be answered, "No." General Motors cannot enjoin the defendant from the use of the word "Cadillac" in its corporate name or on its boats.

■ The word "Cadillac" standing alone, cannot be exclusively appropriated.

## FEES AND COSTS

Defendant in its answer to the complaint and in a motion for costs and attorney fees, seeks an award for costs and attorney fees.

The substance of defendant's claim in this regard is that plaintiff brought the present action purely as part of a design intended to force capitulation by economic coercion.

This court finds considerable evidence upon the record to sustain such an allegation. The facts in regard to the dates of the parties' filing of the application and opposition with the Patent Office have been previously noted.[42]

In the December 1956 application for an extension of time in which to take testimony, Mr. Mosher, in his affidavit on behalf of plaintiff stated: "The attorneys for *both sides* wish to explore the possibility of settling the controversy." (Emphasis supplied.) Defendant opposed the extension, since *as a matter of fact*, it was clear that General Motors was not interested in settlement, but in a complete capitulation by Cadillac Marine & Boat Co., whereby all defendant's legal right to the trade-mark "Cadillac" would be surrendered.

Defendant, contrary to the affidavit, was not willing to explore settlement on such a basis as plaintiff was well aware.

---

41. Callmann, Unfair Competition and Trade-Marks, Second Edition, Volume 3, Pages 1120–1, Geographical Marks:

"No one is entitled to claim an exclusive right to the use of a geographical term in common use."

See also the discussion, supra, on pages 13–22.

42. Page 6.

On the issue of right to the trade-mark "Cadillac," defendant wanted a determination of plaintiff's opposition filed with the Patent Office.

An inference must then arise that plaintiff sought the extension in order to gain time to pursue another, more fruitful course in the attempt to force capitulation of the defendant.

Then, in an apparent effort to bring more economic pressure to bear, plaintiff filed this suit, which resulted in a complete suspension of the Patent Office proceedings, since it was represented that what plaintiff sought by way of remedy in this court was beyond the power of the Patent Office to grant.

Specifically, these remedies were an injunction against the use of the trademark "Cadillac" by defendant during the pendency of this suit, a permanent injunction after judgment, and an accounting and judgment to pay damages sustained by plaintiff. Plaintiff claimed it would also sustain irreparable damages if defendant were not temporarily and permanently enjoined from further use of the name "Cadillac." Plaintiff also sought treble damages.

The request for a temporary injunction was completely ignored by plaintiff during the pendency of this suit. No proof was ever offered during the trial on the issue of damages. Counsel for plaintiff, Mr. Halliday, discussing this point while arguing against allowance of fees to defendant's attorneys, said that no such proofs were offered since it was his understanding from the cases that such evidence was to be offered only after judgment was entered.

Without passing upon the merits of such a theory, the court observes that plaintiff could not seriously contend that the entry of Cadillac boats upon the American market in the channels of the boating industry affected its own sales. To the contrary, plaintiff in the last ten years sold more Cadillac cars than it had in all its previous years combined.

This is clearly why from the beginning plaintiff avoided the clash or contest on this issue. It is inconceivable that plaintiff suffered any damage in this case.

The only remedy which plaintiff in good faith pursued in this District Court action was that of a permanent injunction against the use of the name "Cadillac." [43]

Although the Patent Office could not award such an injunction, it is apparent that adjudication by the Patent Office in favor of plaintiff's filed opposition would have had the same result. That is, defendant would necessarily have then been forced to discontinue use of the trade-mark "Cadillac."

An additional element which bears upon this issue is the settlement offer made by defendant to plaintiff in the letter of Mr. Robert Heaney to Mr. Mosher.[44] That settlement by its terms offered, as plaintiff should equitably have known, all that General Motors was entitled to under the law. That offer was made before the commencement of this action, and it was reaffirmed by defendant's letter Exhibit CC.

The evidence compels the conclusion that this action was commenced with the intent to further pressure defendant to capitulate.

In the past General Motors has used its economic power to force capitulation by others who might have had a valid legal claim on the trade-mark "Cadillac" or any derivative thereof. This is illustrated by plaintiff's Exhibits 115 and 116, previously discussed in this opinion. There, a majority of the challenged users of "Cadillac" either capitulated upon receipt of the letter from

---

43. Specifically, at the pretrial January 29, 1963, plaintiff agreed that the single remaining issue before the court was the use of the name "Cadillac."

44. See defendant's Exhibit CC. Defendant's Exhibit DD was an answer to this letter and a careful examination of the cases cited in that letter shows that they are clearly distinguishable from the case before this court and are irrelevant and immaterial

General Motors, or agreed to a consent judgment or decree in favor of General Motors after some court action.

The prospect of facing litigation against the plaintiff is awesome. In this case plaintiff was represented by a New York law firm, a Detroit law firm, and the company's own legal staff.

Defendant had the representation of a Grand Rapids law firm and a firm of patent attorneys from Chicago, but had to dismiss the firm of patent attorneys because it could not bear the cost burden. Defendant ended up with representation by the Grand Rapids law firm. The defendant, as we have noted above, has been undergoing reorganization in bankruptcy under Chapter X. Plaintiff regularly watched the financial condition of the defendant through Dun & Bradstreet ratings.

The law is clear that this court has the power to award attorney fees. The principle is broadly stated in Moore's Federal Practice, Vol. 6, at 1352, where it is said:

"* * * a federal district court may award attorney's fees in favor of one party and against another where an *unfounded* action or defense is *brought or maintained* in bad faith, vexatiously, wantonly, or for oppressive reasons." (Emphasis supplied.)

■ It is a fundamental principle that he who seeks equity must do equity. Before the commencement of this suit, plaintiff was offered all to which it was entitled. At this point it was incumbent upon the plaintiff to do equity.

The latest statement of this rule by the United States Supreme Court is the case of Vaughan v. Atkinson, 369 U.S. 527, at page 530, 82 S.Ct. 997, at page 999, 8 L.Ed.2d 88 at page 91 (1962), where the court observed:

"Counsel fees have been awarded in equity actions, as where Negroes were required to bring suit against a labor union to prevent discrimination. Rolax v. Atlantic Coast Line R. Co. (CA 4 Va), 186 F.2d 473, 481. As we stated in Sprague v. Ticonic

Nat. Bank, 307 U.S. 161, 164, 59 S. Ct. 777, 779, 83 L.Ed. 1184 [1186], allowance of counsel fees and other expenses entailed by litigation, but not included in the ordinary taxable costs regulated by statute, is '*part of the historic equity jurisdiction of the federal courts.*'" (Emphasis supplied.)

Defendant has cited the case of Parker Rust Proof Co. v. Ford Motor Co., (E.D. Mich., 1928) 23 F.2d 502. Although the situation there is not completely analogous with that confronting this court in the present case, Judge Tuttle's decision does provide guidance. In that patent infringement case, defendant had clearly infringed plaintiff's patent. During the trial the defendant presented a defense consisting of complex experiments which the plaintiff was put to unusual expense to meet.

The Federal District Court Judge noted that the defendant was one of the largest corporations in existence, which could easily discourage litigation adverse to it by the simple expedient of making it expensive, while the plaintiff was a small corporation upon whom the expense of trial put a great burden. The court awarded the plaintiff, $98,000.

■ In the present case, the plaintiff, one of the largest corporations in the world, brought the action out of reach of a much earlier and much less expensive action in the Patent Office to seek a highly similar result in the Federal District Court. It appears to this court that the purpose of such a removal by the plaintiff was designed not to seek a greater scope of remedies, but to place such an economic burden upon the defendant, a small corporation of limited assets, that it would be forced to yield the unjust demands of the plaintiff.

Therefore, this court awards defendant the cost of its attorney fees and other costs in the amount of $41,000.

The findings of fact and conclusions of law in this opinion shall be deemed to be findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure.