**HBP, INC., Plaintiff,**

**v.**

**AMERICAN MARINE HOLDINGS, INC., Defendant.**

**No. 6:02–CV–957–ORL22DAB.**

United States District Court,
M.D. Florida.
Orlando Division.

Oct. 10, 2003.

Richard E. Mitchell, Gray, Harris & Robinson, P.A., Orlando, FL, Martin J. Elgison, John D. Haynes, Andrew J. Wilson, Alston & Bird, LLP, Atlanta, GA, James F. Page, Jr., Page Mediation, Orlando, FL, for HBP, Inc., a Delaware Corporation, plaintiff.

F. Steven Herb, Nelson, Hesse, Cyril, Smith, Widman, Herb, Causey & Dooley, Sarasota, FL, Ava K. Doppelt, Allen, Dyer, Doppelt, Milbrath & Gilchrist, P.A., Orlando, FL, for American Marine Holdings, Inc., a Delaware Corporation, defendant.

### ORDER

BAKER, United States Magistrate Judge.

This cause came on for consideration without oral argument on the following motions filed herein:

**MOTION: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 24)**

**FILED: June 11, 2003**

**THEREON it is ORDERED that the motion is DENIED as moot.**

**MOTION: DEFENDANT'S CORRECTED MOTION FOR SUMMARY JUDGMENT (Doc. No. 34)**

**FILED: June 13, 2003**

**THEREON it is ORDERED that the motion is GRANTED.**

Plaintiff HBP, Inc. filed suit against Defendant American Marine Holdings, Inc. ("American Marine") alleging that American Marine's "Daytona" racing boats infringe and dilute HBP's "Daytona" trade and service marks, and asserting related claims for deceptive practices, unfair competition, and injury to business. Doc. No. 1. American Marine filed its Corrected Motion for Summary Judgment (Doc. No. 34) on June 13, 2003, and HBP filed its response on July 3, 2003. Doc. 37.

### STANDARD FOR DECISION

■ A party is entitled to judgment as a matter of law when the party can show that there is no genuine issue as to any material fact. Fed. R. Civ. Pro. 56(c). The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of proving that no genuine issue of material fact exists. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party

opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. HBP contends that a number of cases hold that, because of the factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena, citing district court cases from other circuits. Courts in this Circuit have held that cases must be decided on their facts, and in some trademark infringement cases, summary judgment is appropriate when there is no material factual issue on infringement of the trademark. *See, e.g., Gift of Learning Foundation, Inc. v. TGC, Inc.,* 329 F.3d 792, 802 (11th Cir.2003) (affirming summary judgment that as a matter of law no infringement of the term DRIVE PITCH & PUTT had occurred). Although likelihood of confusion generally is a question of fact, this Circuit has decided the issue as a matter of law in infringement cases. *Alliance Metals, Inc., of Atlanta v. Hinely Industries, Inc.,* 222 F.3d 895, 907 (11th Cir.2000) (granting summary judgment to former employer for former employee's infringement through use of confusingly similar trade name); *Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.,* 931 F.2d 1519, 1523 (11th Cir.1991) (granting summary judgment finding no infringement of descriptive term "invest" used by defendant Investcorp.); *Beef/Eater Restaurants, Inc. v. James Burrough Limited,* 398 F.2d 637, 639 (5th Cir.1968) ("the trial judge, by inspection of trademarks, may himself determine, and must determine, the likelihood of confusion"); *see also Little League Baseball, Inc. v. Daytona Beach Little League, Inc.,* 1977 WL 22777, 193 U.S.P.Q. 611, 614 (M.D.Fla.1977) (granting summary judgment to franchisor on infringement claim against former franchisee).

In *Universal Money Centers, Inc. v. American Telephone & Telegraph Co.,* the plaintiff, like HBP, argued that trademark infringement cases should not be decided at the summary judgment stage because the case involved complex factual issues and required credibility determinations. The Tenth Circuit held:

> While we agree that the issue of likelihood of confusion is a question of fact, this does not preclude the entry of summary judgment in trademark infringement cases. Indeed, as the Second Circuit has pointed out, courts retain an important authority to monitor the outer limits of substantial similarity within which a jury is permitted to make the factual determination whether there is a likelihood of confusion as to source. Though likelihood of confusion is frequently a fairly disputed issue of fact on which reasonable minds may differ, the issue is amenable to summary judgment in appropriate cases.

22 F.3d 1527, 1530 n. 2 (10th Cir.1994) (affirming summary judgment for defendant) (citations omitted). *See also Kazmaier v. Wooten,* 761 F.2d 46, 48 (1st Cir.1985) (affirming summary judgment on trade name infringement claim; "[w]hile infringement and unfair competition cases often present factual issues that render summary judgment inappropriate, this is not invariably so"); *Door Systems, Inc. v. Pro–Line Door Systems, Inc.,* 83 F.3d 169, 171 (7th Cir.1996) (affirming summary judgment finding no infringement of mark "door systems"; "any question of fact can be resolved on summary judgment if the evidence is so one-sided that there can be no doubt about how the question should be answered"); *Murray v. Cable Nat'l Broadcasting Co.,* 86 F.3d 858, 860 (9th Cir.1996) (the factual nature of the likelihood of confusion issue does not preclude the district court from determining likelihood of confusion as a matter of law and granting summary judgment).

## BACKGROUND FACTS[1]

HBP is in the business of promoting, organizing and conducting stock car and motorcycle races, such as the widely-known Daytona 500 stock car race and Daytona 200 motorcycle race. Doc. No. 1 ¶ 8. HBP also owns a number of racing venues including the Daytona International Speedway in Daytona Beach, Florida. *Id.* HBP has developed several "Daytona" registered trademarks, including Daytona USA, Daytona 500, Daytona International Speedway, 24 Hours of Daytona, Daytona 200, Daytona Pit Shop, Daytona Speedware, Daytona Speedweeks, and Daytona at the Speed of Light. *Id.* ¶ 10. Since 2001, Daytona International Speedway has hosted a major boat show, featuring a variety of watercraft and related products including high performance racing boats and fishing boats. *Id.* ¶ 20. These boat shows have been held in conjunction with the American Power Boat Association's Offshore Grand Prix boat races. *Id.* The 45–acre man-made lake at the infield of the Daytona International Speedway, Lake Lloyd, has also been the site for boat races and boat testing since 1959, and for numerous fishing tournaments over the years. *Id.* In addition to licensing its Daytona marks, such as for motorsport racing events, theme parks, video games, clothing, and bicycles, HBP has entered into several "official sponsorship" agreements with various companies giving the sponsors the exclusive right to use "Daytona" marks for their goods. *Id.* ¶ 26, 27.

Beginning in 1997, American Marine, through its Donzi Boats division, began promoting a series of high performance ocean-going recreational powerboats for model year 1998 under the model name Donzi Daytona. Doc. No. 25, Kimmel Dep. at 7–8. The Daytona line refers to a high-end premium package available on certain of Donzi's existing models, and includes upgraded amenities such as finished propellers, Kevlar and E-glass structural upgrades to the stepped hull, high performance passenger seating, a premium sound system, twin MerCruiser engines and a selection of distinctive graphics. *Id.* The Donzi Daytona line has received favorable publicity in the boating press. *Id.*

In 1999 American Marine filed a trademark application with the United States Patent and Trademark Office (the "PTO") to register its Daytona trademark for its Donzi boat line. *Id.* at Ex. 1. The PTO approved the mark for registration and it was published in the Official Gazette on April 23, 2002. *Id.* at Ex. 2.

In August 2002, HBP filed this suit against Donzi for trademark infringement and dilution along with related state claims. Doc. No. 1. HBP also filed an opposition to Donzi's trademark application, which has been stayed by the Trademark Trial and Appeal Board pending the resolution of this case.

## ANALYSIS

American Marine seeks summary judgment on HBP's claims, arguing that there is no likelihood of confusion between Donzi's Daytona series of boats and HBP's "Daytona" trademarks and service marks. American Marine also contends that HBP's marks are not famous for purposes of dilution. HBP argues in response that summary judgment should be denied to American Marine because trademark cases should rarely be decided on summary

---

1. The facts are either undisputed or read in the light most favorable to the non-moving party, HBP, as they must be on summary judgment. For this reason, American Marine's arguments with regard to the HBP ownership of certain trademarks and/or licensing (*see* Doc. Nos. 51 & 54) are not addressed but are considered in the light most favorable to HBP.

judgment and there are numerous disputed issues of material fact remaining which cannot be resolved on summary judgment.

### LIKELIHOOD OF CONFUSION

■ Trademarks are "any word, name, symbol, or device, or any combination thereof [used] to identify and distinguish [one's] goods ... from those manufactured or sold by others and to indicate the source of the goods." *Leigh v. Warner Bros., Inc.,* 212 F.3d 1210, 1216–1217 (11th Cir.2000) (citing 15 U.S.C. § 1127). In order to succeed on the merits of a trademark infringement claim, a plaintiff must show that the defendant used the mark in commerce without its consent and "that the unauthorized use was likely to deceive, cause confusion, or result in mistake." *Davidoff & CIE, S.A. v. PLD Intern. Corp.,* 263 F.3d 1297, 1301 (11th Cir.2001). The plaintiff's use of the mark must predate the defendant's potentially confusing mark. *Leigh,* 212 F.3d at 1216–1217 (citing 15 U.S.C. § 1127); 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §§ 16:1, 16:4 (4th ed.2000).

■ The determination on infringement generally boils down to whether there is a "likelihood of confusion." *Davidoff,* 263 F.3d at 1301. As the Eleventh Circuit has explained:

> To understand what type of consumer confusion is actionable under the Lanham Trade–Mark Act, it is useful to review Congress' purposes for enacting trademark legislation. Congress sought to protect two groups: consumers and registered trademark owners. In protecting these groups lawmakers recognized that every product is composed of a bundle of special characteristics. Consumers who purchase a particular product expect to receive the same special characteristics every time. The Lanham Act protects these expectations by excluding others from using a particular mark and making consumers confident that they can purchase brands without being confused or misled. Thus trademark law ensures consistency for the benefit of consumers.

> The Lanham Act also protects trademark owners. A trademark owner has spent time, energy and money in presenting a product to the public and building a reputation for that product. The Act prevents another vendor from acquiring a product that has a different set of characteristics and passing it off as the trademark owner's product. This would potentially confuse consumers about the quality and nature of the trademarked product and erode consumer goodwill.

*Davidoff,* 263 F.3d at 1301–1302. American Marine contends that under no view of the facts will HBP be able to establish that there is a likelihood of confusion between the Donzi Daytona and HBP's "Daytona" marks.

■ The parties both cite to the seven factors the Eleventh Circuit uses to consider whether a likelihood of confusion exists: (1) the strength of the plaintiff's mark; (2) the similarity of the marks; (3) the similarity of the parties' products or services; (4) the similarity of the parties' retail outlets and customers; (5) the similarity of advertising media used; (6) the existence of actual confusion; and (7) the defendant's intent. *Dieter v. B & H Ind. of Southwest Florida, Inc.,* 880 F.2d 322 (11th Cir.1989); *Frehling Enters., Inc. v. Int'l Select Group, Inc.,* 192 F.3d 1330, 1335 (11th Cir.1999). The type of mark and the evidence of actual confusion are the most important factors according to the Eleventh Circuit. *See Times Newspapers, Ltd. v. Times Pub. Co.,* 1993 WL 120614, *6 (M.D.Fla. Jan.13, 1993) (citing *Dieter,* 880 F.2d at 326). The Court must

consider the circumstances of each particular case, and evaluate the weight to be accorded to individual factors, in order to make its ultimate factual decision. *Jellibeans, Inc. v. Skating Clubs of Ga.*, 716 F.2d 833, 844 (11th Cir.1983).

### 1. Strength of the "Daytona" mark

■■■ HBP contends that the Daytona family of marks is very strong. In response, American Marine contends that HBP's marks are weak because the marks are geographically descriptive and there is evidence of widespread third-party use. A geographically descriptive mark is generally considered not inherently distinctive, but weak, and given a narrow range of protection. *Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1522 (11th Cir.1991); *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 974 (11th Cir.1983). Descriptive marks, which describe the qualities or characteristics of a product, may be registered only if the holder of the mark shows that the mark has acquired distinctiveness through secondary meaning. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). Another court analyzing infringement of a geographic term explained:

> A phrase that first enters our vocabulary as a geographic term is not protectable as a trade mark or service mark unless it acquires secondary meaning, either by operation of law (incontestability status) or by proof that a sufficient segment of a relevant market group comes to associate the phrase not just with the geographic place it originally

signified, but also with a single source of goods or services available in the marketplace. *McCarthy*, §§ 14:1, 14:5. Words that describe the geographic origin of goods, or the geographic location where services are provided, are not *inherently* distinctive. But a commercial user of a geographic term can earn legal protection for it either by satisfying the requirements for incontestability or by developing use of the term to the point where a sufficient group ascribes an additional (secondary) meaning to it.

*Pebble Beach Co. v. Laub America Corp.*, 1985 WL 5584, *7 (N.D.Cal. Dec.27, 1985). In this case, HBP is the exclusive licensee of several incontestable "Daytona" marks: "Daytona," "Daytona USA," and "Daytona International Speedway" for racing events, novelty license plates, and household or personal items; "Daytona 200" for motorcycle racing; "Daytona 500" and "24 Hours of Daytona" for automobile racing and household items; "Daytona Speedware" for paper goods, housewares, and clothing. Doc. No. 1 at 12–16.

■■■ Five years after registering a mark, the holder may have its mark declared "incontestable" by filing the affidavit required by 15 U.S.C. § 1065(3). The incontestability provisions of the Lanham Act were designed to provide a means for a trademark holder to "quiet title in the ownership of his mark." *Park 'N Fly*, 469 U.S. at 198, 105 S.Ct. 658. Once a mark has become incontestable, its validity is presumed, subject to certain enumerated defenses set out in 15 U.S.C. § 1065, not applicable in this case.[2]

---

**2.** The defenses to an incontestable mark are: (1) "obtained fraudulently;" (2) "abandoned;" (3) allow others to use the mark … so as to misrepresent the source of the goods or services"; (4) non-trademark use, "used fairly" and in "good faith"—only to describe the goods or services of such party;" (5) lack of knowledge of registrant's prior use; (6) prior

use of non-registered users marks; (7) used to violate antitrust laws of U.S.; (8) mark is functional; and (9) equitable principles, including laches, estoppel and acquiescence are applicable. A mark becomes incontestable through five years' continuous use following federal registration and compliance with statutory formalities. 15 U.S.C. § 1065.

According to the Eleventh Circuit, an incontestable mark is presumed "to be at least descriptive with secondary meaning, and therefore a relatively strong mark." *Dieter,* 880 F.2d at 329; *Frehling Enterprises, Inc. v. International Select Group, Inc.,* 192 F.3d 1330, 1336 (11th Cir.1999) (a mark's incontestability serves to enhance its strength).

■■■■■ However, American Marine argues that the incontestable status, standing alone, does not render a mark strong. It is true that once a mark is incontestable, as HBP asserts, its validity cannot be attacked on the basis that it is merely descriptive and not worthy of trademark protection. *See Dieter,* 880 F.2d at 329. However, incontestability only addresses the first part of the infringement analysis, that is, whether a mark is valid, entitled to protection, and owned by a plaintiff; incontestable status—somewhat of a misnomer—does not mean that a mark's strength cannot be attacked. *First Keystone Federal Sav. Bank v. First Keystone Mortg., Inc.,* 896 F.Supp. 456, 461 (E.D.Pa. 1995) (incontestability is the doctrine that a registered trademark is presumed to be distinctive, which is the strongest type of mark, but this does not mean that a mark's strength cannot be attacked). When determining the mark's strength for the likelihood of confusion analysis, incontestability is "simply one piece of the overall determination of a mark's strength." *Id.*

American Marine argues that HBP's incontestable "Daytona" marks are weak because they are geographically descriptive and used by many third-parties, which is an important factor in gauging the strength of the mark. *See Frehling Enterprises, Inc. v. International Select Group, Inc.,* 192 F.3d 1330, 1336 (11th Cir.1999) (third-party use must be considered even in assessing the strength of all marks, even incontestable marks); *John*

*H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 974–75 (11th Cir.1983); *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n,* 651 F.2d 311, 316 (5th Cir. 1981); *see also Therma–Scan, Inc. v. Thermoscan, Inc.,* 295 F.3d 623, 632 (6th Cir.2002) (holding that the incontestable status of Therma–Scan's trademark was not relevant to the ultimate issue of whether confusion was likely to occur, and mark was not strong because it was descriptive and lacked broad public recognition).

■■■ The less that third parties use the mark, the stronger it is, and the more protection it deserves. *Frehling Enterprises,* 192 F.3d at 1332; *John H. Harland Co.,* 711 F.2d at 975. As the Eleventh Circuit explained in *Frehling,* "Where there is lack of third-party use, the mark's strength is enhanced, as it is distinctive, and therefore more easily recognized by consumers." *Frehling Enterprises,* 192 F.3d at 1336. Extensive third party use of the mark or a term used in the trademark weakens the strength of the mark. *See, e.g., Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n,* 651 F.2d 311, 316 (5th Cir.1981) (evidence of 75 third-party financial companies registered in Florida using the word "Sun" in their names was impressive evidence that there would be no likelihood of confusion between Sun Banks and Sun Federal); *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 260 (5th Cir. 1980) (72 third-party registrations of the mark "Domino"); *Armstrong Cork Co. v. World Carpets, Inc.,* 597 F.2d 496, 505 (5th Cir.1979) (wide use of mark "World" results in little likelihood of confusion); *Holiday Inns, Inc. v. Holiday Out in America,* 481 F.2d 445, 448 (5th Cir.1973) (common word "Holiday" is of weak trademark significance); *El Chico, Inc. v. El Chico Cafe,* 214 F.2d 721, 725 (5th Cir.1954) (27 trademark registrations of "El Chico," along with the fact it was the name of a Moorish

**1330**

king of Granada in 1482, and is the name of a Mexican town and a river in the Philippines, make the term a weak trade name deserving limited protection); *Carnival Corp. v. SeaEscape Casino Cruises, Inc.*, 74 F.Supp.2d 1261, 1266 (S.D.Fla. 1999) (evidence of numerous third-party registrations for marks including the term "fun" in the travel, gaming, and entertainment industries weakens the strength of the "Fun Ship" mark); *Michael Caruso & Co. v. Estefan Enter., Inc.*, 994 F.Supp. 1454, 1459 (S.D.Fla.1998) (finding that defendant's evidence of extensive third-party use of the term "bongo" renders it unlikely that the mark will have strong trademark significance), *aff'd*, 166 F.3d 353 (11th Cir. 1998).

HBP's race track and associated activities and products on which its marks are used are located in or emanate from Daytona Beach, a city commonly referred to as Daytona. American Marine argues that it is natural for Daytona Beach area businesses to use Daytona in their names. American Marine has provided evidence in support of its Motion for Summary Judgment demonstrating that there are more than 200 active and inactive federal and state trademarks containing the word "Daytona" for a variety of goods and services. Doc. No. 31. American Marine's evidence also shows more than 225 active Florida corporations have names that begin with the word "Daytona" and not "Daytona Beach." Doc. No. 29. It is no surprise that a number of businesses in the Daytona Beach Area (who may or may not be registered as Florida corporations) use the name "Daytona" (but not "Daytona Beach") on their signage; American Marine has provided fourteen examples. Doc. No. 27.

 Rather than dispute American Marine's evidence of third-party use, HBP instead argues that American Marine has not offered evidence that the third-party uses are on-going or have in any way weakened the association that exists in consumers' minds between HBP and the Daytona marks.[3] HBP cites several cases which, HBP says, require the Court to determine whether "unauthorized third-party uses" significantly diminish the public's perception that the mark identifies items connected with the owner of the mark. These cases are inapposite, primarily because the marks involved in the cited cases are either not geographically descriptive, but arbitrary marks, or involve trade dress, or the opinion contains no analysis regarding the impact of third-party uses of the mark. *University of Georgia Athletic Ass'n v. Laite*, 756 F.2d 1535, 1546 n. 27 (11th Cir.1985) (arbitrary "UGA bulldog" mark infringed by "brewing bulldog" beer); *Jaret Int'l, Inc. v. Promotion in Motion, Inc.*, 826 F.Supp. 69, 76 (E.D.N.Y.1993) (trade dress for Sour Patch Kids infringed by "nearly identical" placement of boy's face on left-hand side of trade dress of Sour Jacks), and *Express, Inc. v. Sears, Roebuck & Co.*, 840 F.Supp.

---

**3.** HBP also contends that the Court should not consider American Marine's affidavits because the affiants are employed by counsel for American Marine. HBP has provided the exact same type of declaration from John Haynes, HBP's counsel, who reviewed the Donzi website. *See* Doc. No. 39. HBP also complains of certain exhibits substantiated by certain declarants because they were never identified in discovery as individuals with knowledge of relevant facts. The exhibits were trademark and corporate name information easily obtained by anyone seeking it, and not within the particularized knowledge of any one individual; such information is admissible for purposes of Rule 56. *Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1565 (Fed.Cir.1987) (third-party registrations are admissible and competent to negate a claim of exclusive rights in a trademark and the disclaimers are evidence, albeit not conclusive, of descriptiveness of the term).

502, 507 (S.D.Ohio 1993) (no analysis of third-party use of arbitrary "express" mark on competing apparel). HBP relies most heavily on the case of *Miss Universe, Inc. v. Miss Teen U.S.A., Inc.*, 1980 WL 30268, 209 U.S.P.Q. 698, 707 (N.D.Ga. Mar.25, 1980), in which the court specifically recognized that "third party uses . . . militate against a finding of secondary meaning." The holding on which HBP relies is actually on the issue of dilution; the court held that plaintiff's "Miss USA" mark, which had consistently been held to have attained secondary meaning would be diluted by defendant's use of "Miss Teen U.S.A." for its pageant for teenagers. *Id.* at 707, 1980 WL 30268.

HBP fails to cite any case that specifically deals with third-party use of a geographically descriptive mark, or specifically one that includes the name of a city. There is no city in Florida named "Daytona"; Daytona Beach is one of three cities in Central Florida that contain the name "Daytona," the others being Daytona Beach Shores and South Daytona. *See Loggerhead Turtle v. County Council of Volusia County, Fla.*, 148 F.3d 1231, 1235 (11th Cir.1998)[4]; *Continental Cas. Co. v. City of South Daytona*, 807 So.2d 91, 92 (Fla. 5th DCA 2002). Daytona Beach is well-known throughout the country as a popular vacation spot and spring break destination, as well as the destination for other events with a national appeal, such as Bike Week, Biketoberfest, and Black College Reunion. *See Echo Travel, Inc. v. Travel Associates, Inc.*, 870 F.2d 1264 (7th Cir.1989) (dispute involving national promoters of spring break trips to Daytona Beach); *Florida State Conference of NAACP Branches v. City of Daytona Beach, Fla.*, 54 F.Supp.2d 1283, 1284 (M.D.Fla.1999) (Black College Reunion is an event which has been attended by 100,-000 participants from all 105 historically black colleges and universities throughout the United States). The fact that these well-attended events are held in the "Daytona" area reflects the popularity of the beach and the weather, rather than necessarily an association with the speedway or racing.

In other cases involving geographically descriptive marks, even when marks have become incontestable, courts have rejected claims of infringement for another's use of the location's name. *See, e.g., Pebble Beach Co. v. Laub America Corp.*, 1985 WL 5584, *35 (N.D.Cal. Dec.27, 1985) (holding that plaintiff has failed to prove that the mark "Pebble Beach" is strong or that defendant's use of the words "Pebble Beach" on softgoods or souvenirs was likely to cause confusion with the famous California golf resort and tournament owned by plaintiff); *First Keystone Federal Sav. Bank v. First Keystone Mortg., Inc.*, 896 F.Supp. 456, 461 (E.D.Pa.1995) (holding that the word "Keystone" in plaintiff's mark, although incontestable, was not strong because it is a geographic description for Pennsylvania, the "Keystone State," and is used by many third-parties); *Long Island–Airports Limousine Service Corp. v. New York Airport Services Corp.*, 641 F.Supp. 1005 (E.D.N.Y.1986) (holding that a New York limousine service using the appellation "Long Island" in its title was not entitled to a preliminary injunction preventing a Connecticut competitor from using "Long Island" on its limousines); *cf. National Football League Properties, Inc. v. ProStyle, Inc.*, 16

---

**4.** Adjoining the Atlantic Ocean for nearly forty miles in northeast Florida, Volusia County's beach communities include Ormond–by–the–Sea, Ormond Beach, Daytona Beach, Daytona Beach Shores, Wilbur–by–the–Sea, Town of Ponce Inlet, City of New Smyrna Beach and Bethune Beach. *See Loggerhead Turtle v. County Council of Volusia County, Fla.*, 148 F.3d 1231, 1235 (11th Cir.1998).

F.Supp.2d 1012, 1015 (E.D.Wis.1998) (holding that apparel bearing the name of "Green Bay" infringed the Green Bay Packers' trademark rights only when used in combination with the colors green and yellow in a professional football context). The geographic origin and resulting widespread third-party use of "Daytona" weighs against the strength of HBP's marks, even though several are incontestable.

### 2. The similarity of the marks

■■■ American Marine contends that its mark, "Daytona" written in a "distinctive script style" does not resemble any of HBP's marks and that all of its Donzi Daytona boats and promotional materials prominently feature the name "Donzi" adjacent to or near the name "Daytona." HBP disputes this, contending that some of American Marine's promotional materials do not have Donzi near the Daytona name. To determine the similarity of the marks, the court compares the marks and considers the overall impressions that they create, including the sound, appearance, and manner in which they are used. *Frehling Enterprises, Inc. v. International Select Group, Inc.,* 192 F.3d 1330, 1337 (11th Cir.); *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 975 (11th Cir.1983).

The Court has reviewed the materials that HBP points to as examples of American Marine's use of "Daytona" without Donzi in proximity. The Court finds American Marine's representation to be accurate; in the materials HBP points to, the "Donzi" name is always in close proximity (same sentence, page, paragraph, or in photographs or title above text) to the word "Daytona," whether on what is clearly the Donzi website or press release discussing the Daytona line, or in the Donzi Product Information Guide. Ex. 1, AMH 381–82 (Press release), 1147–57, 1226–36, 1326–32 (Product Information Guides);

Doc. No. 39, Haynes Decl., Ex. A HBP 1775–76, 1799, 1800 (Donzi website).

■■■ HBP also contends that American Marine's federal trademark application contradicts Defendant's claim that "Donzi" and "Daytona" are always together because it seeks registration of the Daytona mark without the word "Donzi." Doc. No. 39, Haynes Decl., Ex. B, Application for Trademark Registration. American Marine seeks to register the word "Daytona" in stylized type. *Id.* On the exhibits attached to its Application for Trademark Registration, the boat featured has "DONZI" written all in capitals about three times the size of "Daytona" which is written in script across the bottom of the word "DONZI." HBP has not shown that American Marine, as a practical matter, uses the script Daytona without the "Donzi" designation accompanying it. Whether a design looks similar stems from the overall impression conveyed by the mark and not a dissection of individual features. *Sun–Fun Products, Inc. v. Suntan Research & Development Inc.,* 656 F.2d 186, 189 (5th Cir.1981).

The evidence shows that American Marine consistently uses the name "DONZI" in all caps, three times the size of the model name, Daytona, written in script, which does not look like HBP's block lettering of "Daytona" in all caps, featured in the center of the mark's field. Moreover, American Marine's prominent use of the brand name "DONZI" in conjunction with the script Daytona mark weighs against the likelihood of confusion.

■■■ Even as to goods that are directly competitive, where the appearance and usage of the common elements are dissimilar, confusion is unlikely. In *Nabisco, Inc. v. Warner–Lambert Co.,* the Second Circuit affirmed summary judgment for defendant gum manufacturer of Dentyne Ice, finding that defendant's prominent use of

its well-known house brand, Dentyne, "significantly reduce[d], if not altogether eliminate[d], the likelihood that consumers will be confused as to the source of the parties' products." 220 F.3d 43, 46–47 (2nd Cir. 2000); *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1045–46 (2d Cir.1992) (prominence of the trade names on packages of Excedrin PM and Tylenol PM weighed heavily against a finding of consumer confusion); *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 831 (8th Cir.1999) (prominent display of brand names on Michelina's Lean'N Tasty and Stouffer's Lean Cuisine made marks not confusingly similar as a matter of law).

HBP argues that American Marine's use of Daytona in conjunction with a racing flag design is very similar to HBP's "Daytona" trademarks which features a checkered flag among five other flags above the word "Daytona." Doc. No. 41, Padgett Decl., Ex. A, HBP 20, 26, 28. American Marine uses a checkered racing flag design in a diagonal fashion along the rear quarter of the boat, similar in design to the way other powerboat manufacturers display a checkered flag motif on their speedboats. *See* Doc. No. 37, Ex. 3 AMH 308, 310 (showing competitors' racing boats with checkered flags).

A black and white checkered flag is a generic symbol for racing. HBP cannot and has not trademarked the checkered flag in isolation, it has simply been incorporated into American Marine's mark. American Marine's checkered flag design and use of the script Daytona model name are not so similar to HBP's Daytona marks such that they are likely to cause confusion. *Cf. Frehling Enterprises, Inc. v. International Select Group, Inc.*, 192 F.3d 1330, 1337 (11th Cir.1999) (holding that defendant's addition of "Tavola Collection" before the word "OGGETTI" in caps, was not enough to make the mark dissimilar from plaintiff's "OGGETTI"

mark, both used in advertising home furnishings); *Sun–Fun Products, Inc. v. Suntan Research & Development Inc.*, 656 F.2d 186, 189 (5th Cir.1981) (holding that sunburst marks resembling a corona and encircling a sun-associated figure with a nearly identical pattern of irregular fingers of flame both used for suntan preparations presented genuine issue of material fact on similarity). The marks are not similar, especially when used in conjunction with "DONZI" and this factor weighs in favor American Marine.

### 3. The similarity of the parties' products or services

■ The greater the similarity between the products and services, the greater the likelihood of confusion. *See John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 976 (11th Cir.1983); *see also Therma–Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 632 (6th Cir.2002) (if the goods or services are totally unrelated, confusion is unlikely; if the goods or services are somewhat related but not competitive, the likelihood of confusion turns on other factors). The use of similar marks does not constitute infringement if the products at issue are unrelated. *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 (9th Cir.2000) (no likelihood of confusion between commercial illustrator using the name "Pearl Beach" and toy company's "Pearl Beach Barbie" product); *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 557 (10th Cir.1998) (no likelihood of confusion where marks were same word but visually distinct, parties were not competitors, products were geared toward distinct populations, defendant's services were very expensive, the purchase of which required an especially high degree of sophistication and care, and plaintiff presented little evidence of actual confusion).

■ American Marine contends that it does not offer products similar or competing with those of HBP, and none of HBP's trademark registrations is for boats or marine products. HBP contends that the parties do offer similar goods and services because HBP's Daytona marks are used in connection with what HBP considers to be "the exact same goods and services," *i.e.*, an annual boat show, and boat races and fishing tournaments on Lake Lloyd. Doc. No. 37 at 16.

The Court must determine whether the products are "the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish between the products of the respective parties." *Frehling*, 192 F.3d at 1338. HBP contends that the "mere fact" that it has no trademark registrations of Daytona marks for boat or marine products is "irrelevant" because it is "one of the leading providers of stock car, motorcycle, and truck racing entertainment services in the country" and the marks are "synonymous with speed, racing and competition." It is undisputed that American Marine's Donzi Daytona is a speedboat.

On point is the case of *General Motors Corp. v. Cadillac Marine & Boat Company*, in which the court held that a boat manufacturer's use of the name "Cadillac" for its boats had not infringed a car manufacturer's "Cadillac" trademark. 226 F.Supp. 716, 722 (W.D.Mich.1964). "Cadillac" was historically the name of an explorer, Antione de Mothe Cadillac, and adopted in the territory around Detroit, Michigan for parks, street, cities, and lakes; many businesses had adopted the name before General Motors began using it for one of their automobile divisions. *Id.* The court succinctly stated the problem with adopting a mark that is based on a historical or geographic name:

> [T]he name "Cadillac" as a trademark possesses the infirmities of a trademark

which are characteristic of both an historical and geographic name [which] was known to the plaintiff corporation when it appropriated the name. That others would use "Cadillac" as a business name and a product name was a foreseeable consequence.

*Id.* at 724.

Cadillac Marine chose to use "Cadillac" for its boats because it was originally located in the city of Cadillac, near Lake Cadillac, in Michigan, before it moved its production facility to West Virginia. *Id.* Crucial to the finding of non-infringement in *Cadillac* was the fact that General Motors had never manufactured or sold boats, although it did manufacture marine engines for use in boats and ships larger than those produced by Cadillac Marine. *Id.* at 720. In this case HBP does not claim a parallel activity, *i.e.*, the manufacture of boats or engines, but argues that it is engaged in marine activities via an annual boat show, fishing tournaments, and boat races that take place on Lake Lloyd. In *Cadillac*, the court found that General Motors' large-boat marine engines and converted Cadillac automobile engines used in inboard type boats were not so similar that consumers were likely to be confused. *Id.* at 727–28 (rejecting plaintiff's theory that "public confusion automatically follows the use of the trademark 'Cadillac' upon any other product, no matter how unrelated it may be to Cadillac automobiles"). The court held that "[w]hile Cadillac cars and defendant's Cadillac boats are means for transportation, one on land and one in the water, they do not possess the same descriptive properties.... This differential makes them void of inherent confusing characteristics." *Id.* at 733.

Other courts have affirmed summary judgment to defendants when there was no likelihood of confusion because the trade-

marks were for products sold in different industries. *See, e.g., Checkpoint Systems, Inc. v. Check Point Software Technologies, Inc.,* 269 F.3d 270, 282 (3rd Cir.2001) (no likelihood of confusion between trademark "Checkpoint," used by the provider of theft-deterrent electronic security products for retailers, and "CHECKPOINT" trademark used by a provider of computer network security "firewall" programs); *Therma–Scan, Inc. v. Thermoscan, Inc.,* 295 F.3d 623, 641 (6th Cir.2002) (facts failed to raise a genuine issue as to the likelihood of consumers' confusion regarding the origin of Therma–Scan's diagnostic thermal imaging examinations and Thermoscan's ear-activated thermometers); *Universal Money Centers, Inc. v. American Telephone & Telegraph Co.,* 22 F.3d 1527, 1530 n. 2 (10th Cir.1994) (affirming summary judgment for defendant where electronic banking services provider that used "Universal" on its plastic debit cards failed to show likelihood of confusion caused by telephone company's use of "universal" to describe its combination of telephone and retail credit card).

The case on which HBP relies, *E. Remy Martin & Co. v. Shaw–Ross International Imports, Inc.,* 756 F.2d 1525, 1530 (11th Cir.1985) is distinguishable because it involved parties who both sold alcoholic beverages—wine and cognac or brandy—goods which the Eleventh Circuit held to be "related in the mind of consumers." *See also Frehling Enterprises, Inc. v. International Select Group, Inc.,* 192 F.3d 1330, 1337 (11th Cir.1999) (involving competing manufacturers of home furnishings). The Donzi Daytona boats and HBP automobile or motorcycle races are products (or services) which are not similar, and this factor weighs in favor of American Marine.

### 4. The similarity of the parties' retail outlets and customers

█ Dissimilarities between the retail outlets for and the predominant customers of HBP's and American Marine's goods lessen the possibility of confusion, mistake, or deception. *See John H. Harland Co.,* 711 F.2d at 975. American Marine contends that there is no similarity in the parties' retail outlets in this case because Donzi Daytona boats are sold only through authorized Donzi dealers and HBP's goods and services are offered at or around its track facilities or at general retail outlets. HBP contends that the outlets are similar, though admittedly not identical. HBP contends that both Donzi's boats and HBP goods are marketed through the Internet.[5] American Marine's evidence shows that the Donzi Daytona boats retail for more than $250,000. HBP sponsors motorsport racing events, and sells retail items such as electronic video games, clothing, bicycles, novelty vehicle license plates, toys and household utensils. Doc. No. 41, Padgett Decl. ¶ 19. These items or event tickets average presumably $200 or less.

HBP contends that there may be Donzi Daytona boat owners who are also car-racing fans. Doubtless this is true, but, as one appellate court has held, "trademarks are unimportant to the average boat buyer" because "common sense and the evidence indicate this is not the type of purchase made only on 'general impressions,'" weighing against a likelihood of confusion. *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 353 (9th Cir.1979). Moreover, when the boats at issue are of high

---

**5.** If use of the Internet were enough to find commercial outlets to be similar, nearly all goods and services would be considered as being marketed together. The fact that both parties have a presence on the Internet does not suggest that their customers are likely to be similar or overlapping.

quality and expensive, it is presumed that the customer exercises greater care in the purchase. *See id.* (when the buyer has expertise in the field and the goods are expensive, the buyer can be expected to exercise greater care in his purchases); *Carnival Corp. v. SeaEscape Casino Cruises, Inc.,* 74 F.Supp.2d 1261, 1267 (S.D.Fla.1999) (customers purchasing through a travel agent plaintiff's three- to six-day vacation cruises costing hundreds to thousands of dollars would give greater forethought to the purchase than customers of defendant's six-hour $39 evening cruises). Given the prospect of spending one-quarter to one-half of a million dollars on a raceboat,[6] a consumer will be more interested in the size and power of the engine, and the luxury accouterments, such as sleeping and eating accommodations, on board, rather than whether the model name is also used in the world of car racing. The lack of similarity in the parties' outlets and the expense of the Donzi Daytona boats militate against a finding of likely confusion.

### 5. The similarity of advertising media used

The greater the similarity in advertising campaigns the greater the likelihood of confusion. *See Ross Bicycles, Inc. v. Cycles USA, Inc.,* 765 F.2d 1502, 1508 (11th Cir.1985). American Marine contends that there is no likelihood of confusion based on the similarity of advertising because Donzi places its print advertising in a number of speciality speed boat magazines and HBP does not advertise in these. *See* Doc. No. 37, Ex. 3. HBP responds that the test is not whether the parties' advertise in the same magazines, but whether there is "significant enough overlap in the readership of the media in

which the parties advertise that a possibility of confusion could result," citing *Frehling,* 192 F.3d at 1340. HBP contends that because both parties advertise extensively in print media, including newspapers, magazines, and on the Internet, they use the "same" media. HBP oversimplifies the holding in *Frehling,* which held that a significant overlap in advertising existed where both parties selling home furnishing advertising in the "very similar" magazines, *Architectural Digest* and *House Beautiful* because "many of the same consumers would be exposed to both magazines, and by derivation, both marks." *Id.*

The evidence shows that the Donzi Daytona is advertised or featured in boating magazines: *Trailer Boats, Boating, Motorboating & Sailing, Hot Boat, Powerboat, Power Runs America, Boating World.* Doc. No. 37, Ex. 3. HBP advertises its products/events in the print media, but HBP did not file or provide information on which print media its advertising is placed, other than in a supplement to the *Daily News;* regardless, it is clear that HBP is not advertising in boating or power boating magazines. Padgett Decl., Ex. C ¶ 18. The dissimilarity of the advertising media used favors American Marine.

### 6. The existence of actual confusion

Actual evidence is the best evidence of likelihood of confusion; however, proof of actual confusion is not a prerequisite to a finding of likelihood of confusion. HBP does not dispute that there is no evidence of actual confusion, does not provide any surveys testing likelihood of confusion, and does not address the issue in its brief.

---

**6.** The Donzi Daytona is touted in the boating press as a popular boat for competing in regional "poker runs"—"waterborne rallies

in which boats compete to reach checkpoints and collect playing cards for a winning hand of poker." Doc. No. 37, Ex. 2, AMH 342.

### 7. The defendant's intent

■ Although objective factors are most important in assessing the likelihood of confusion between two marks, courts also examine the defendant's subjective intent. *See John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 977 (11th Cir. 1983); *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 318–19 (5th Cir.1981) ("That a latecomer adopts another's name or mark, deliberately seeking to capitalize on the other's reputation and benefit from the confusion, is an important factor for any court"). American Marine contends that it had no intention of associating its boat with the activities or products of HBP, since any such association would not be helpful. Kimmel Dep. at 14–15. HBP argues that American Marine adopted its Daytona mark with "the intent to profit from the goodwill that HBP and its affiliates have created in the Daytona marks" because its marks were associated with "high-performance, racing, speed, and competition." Doc. No. 37 at 12.

Donzi's CEO, Lee Kimmel, testified that the name "Daytona" had been inspired in part by a connection with an old company named Daytona Marine. According to Kimmel, Daytona Marine in the 1960's was the first to offer turbo-charged engines to the marine industry and Donzi had been the first company to install those engines in their boats, which had been referred to as "Donzi Daytonas." *Id.* at 10–11. HBP responds that Kimmel's explanation for American Marine's decision to adopt the Daytona was different from the explanation in its interrogatory responses, which stated that Daytona was chosen for the following reason:

[I]t was believed to be available (*i.e.*, not used for any other competitive line of boats or other related types of products), and the name suggests qualities that are positive selling images for boats, such as the Atlantic Ocean, fishing, swimming, leisure activities, vacations, etc."

Doc. No. 39, Haynes Decl. Ex. C, Unsworn copy of American Marine's Response to Interrogatory No. 7. Because the Interrogatory Response that HBP filed with the Court is unsigned, it is not clear whether Kimmel or another individual prepared the response. Kimmel testified at his deposition that he could not remember who had been consulted to provide the responses. Doc. No. 25, Kimmel Dep. at 11. The Court is not troubled by the two responses, since they are not in conflict, but both appropriately support the selection of the name "Daytona." HBP has not produced any evidence which raises a genuine issue of material fact concerning the veracity of Donzi's historic relationship with Daytona Marine.

HBP contends that American Marine has chosen to market its Donzi Daytona powerboats in a manner that "exploits the association with speed." [7] HBP contends that the "clear inference" to be drawn from these statements is that American Marine adopted the Daytona mark with intent to trade upon the strong associations HBP had built through long-standing promotion of speed and racing related goods and services. The Court does not agree. The fact is that the Donzi Daytona is a powerboat, built for speed, and its advertising necessarily reflects this attribute. HBP does not have a trademark

---

7. HBP points to several examples: "One word exemplifies the Daytonas—*Speed.*" Doc. No. 37, Ex. 1 at AMH 1147 Product Information Guide (emphasis in original); "Think of [the Daytona] as a high-end European sedan, able to run the Autobahn alongside Porsches"; "The Corvette of the water"; "Designed by speed freaks ... for adrenaline junkies." *Id.* Ex. 2 at AMH 46; 343; 391.

interest in the generic concept of "speed." None of the slogans HBP refers to mention the Daytona 500 or any other race in particular; to the contrary, one slogan evokes a European high speed situation, "running the Autobahn alongside Porsches." HBP has produced no evidence that American Marine intended to associate its boats with HBP's races, thus this factor favors American Marine.

### 8. Summary of Factors

■ All seven of the factors the Court must consider to determine if a likelihood of confusion exists weigh in favor of American Marine. Not only is this true when considering the factors individually, but, when common sense is applied to the totality of circumstances related to the parties' commercial activities, the conclusion that there is no likelihood of customer confusion as to origin of Defendant's boat is overwhelming.

### DILUTION OF HBP's "DAYTONA" MARKS

■ The owner of a "famous mark" is entitled to an injunction against another party's commercial use of a trademark if the other's use begins after the mark has become famous and causes dilution of the distinctive quality of the mark. 15 U.S.C. § 1125(c); *Portionpac Chemical Corp. v. Sanitech Systems, Inc.,* 217 F.Supp.2d 1238, 1250 (M.D.Fla.2002). To prove a claim of dilution, as HBP asserts, a plaintiff must provide sufficient evidence that: (1) the mark is famous; (2) the alleged infringer adopted the mark after the mark became famous; (3) the infringer diluted the mark; and (4) the defendant's [8] use is commercial and in commerce. 15 U.S.C. § 1125(c); *Portionpac,* 217 F.Supp.2d at 1250–51. The parties dispute whether

HBP's marks are "famous" enough to warrant protection under the statute, and whether American Marine's use dilutes the distinctive qualities of HBP's marks.

### 1. Whether HBP's marks are "famous"

■ The nonexclusive list of factors that a court may consider to determine whether the plaintiff's mark is famous or distinctive includes: a) distinctiveness; b) duration and extent of use; c) the duration and extent of advertising; d) geographical extent; e) channels of trade; f) the degree of recognition of mark; g) the nature and extent of the use of the same or similar marks by third parties; and h) whether the mark is registered. 15 U.S.C. § 1125(c)(1). Incontestability alone is not sufficient to render a mark "famous" for dilution purposes. *Avery Dennison Corp. v. Sumpton,* 189 F.3d 868, 875 (9th Cir. 1999). The mark must have a degree of distinctiveness and strength beyond that needed to serve as a trademark; it must be "truly prominent and renowned." *Id.* As American Marine contends, while HBP's racing events themselves are famous, it does not follow that HBP's marks are necessarily famous. As the Court has already determined above, HBP's marks are not strong based on extensive third-party use and their geographic derivation and are therefore also not "famous" or "distinctive" for purposes of the dilution statute. *Id.* (holding that both "Avery" and "Dennison" were popular surnames and therefore, although both marks had acquired secondary meaning, they were not "famous").

---

**8.** HBP mistakenly argues that it has used the marks in commerce, rather than more appropriately that American Marine has used the mark in commerce. Nevertheless, there is

sufficient evidence of American Marine's use in commerce, the facts must be read in the light most favorable to HBP, and the issue is not disputed.

### 2. Whether American Marine's use of "Daytona" Dilutes HBP's Marks

Assuming *arguendo* that HBP could prove that its marks were famous, American Marine contends that HBP has not presented evidence of a genuine issue of material fact on dilution to prevail on a dilution claim.

In *Moseley v. V. Secret Catalogue, Inc.,* the Supreme Court held that actual dilution—as opposed to a mere likelihood of dilution—is an essential element and must be established. 537 U.S. 418, 123 S.Ct. 1115, 1124–25, 155 L.Ed.2d 1, 14–15 (2003) (holding there was a complete absence of evidence of any lessening of the capacity of the plaintiff's famous mark to identify and distinguish goods or services). HBP concedes that actual harm must be shown, but argues that it need not show an actual loss of sales or profits. HBP contends it can show it has been harmed by American Marine's use of the "Daytona" mark via a loss of licensing revenue and dilution of existing royalty value, citing the Deposition of Glenn Padgett at page 44. However, HBP did not file the Padgett Deposition as part of the record before the Court; a Declaration by Padgett was filed, but it does not contain any information concerning the loss of licensing or royalty revenue. *See* Doc. No. 41.

As American Marine points out, HBP also has not introduced any evidence demonstrating that its customers and potential customers have, as a result of American Marine's use of the "Daytona" mark on its boats, formed any different impression of HBP's products and services. *See Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1026, 1029 (2d Cir. 1989) (holding that automobile manufacturer's use of mark "Lexus," for its new luxury automobile, did not dilute mark "Lexis," used by company providing computerized legal research service; marks were not substantially similar, products did not compete with each other, and "Lexis" mark was not strong outside of market for company's services); *Carnival Corp. v. SeaEscape Casino Cruises, Inc.,* 74 F.Supp.2d 1261, 1271 (S.D.Fla.1999) (plaintiff's dilution claim failed where plaintiff's "Fun Ship" mark lacked distinctiveness and plaintiff had not shown that defendant's use of the slogan about a "Ship Full of Fun!" had decreased plaintiff's mark's commercial value). HBP has failed to present a genuine issue of material fact on actual harm to support its claim of dilution, and the claim is due to be dismissed.

### REMAINING STATE LAW CLAIMS

HBP concedes that its claims for state trademark infringement, unfair competition, and deceptive and unfair trade practices require proof of the same elements as the parallel federal claims for trademark infringement. Doc. No. 37 n. 4 ("HBP agrees with [American Marine] that the 'facts and circumstances necessary to prove plaintiff's state trademark infringement, unfair competition and dilution claims are the same as those necessary to prove ... its parallel federal claims.' "); *see Gift of Learning Foundation, Inc. v. TGC, Inc.,* 329 F.3d 792, 802 (11th Cir.2003) (holding that the analysis of the Florida statutory and common law claims of trademark infringement and unfair competition is the same as under the federal trademark infringement claim); *Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.,* 931 F.2d 1519, 1521 (11th Cir.1991) (same). The Court has found that there is no material issue of fact concerning likelihood of confusion and HBP's claims for federal trademark infringement are due to be dismissed; therefore, HBP's state claims for state trademark infringement, unfair competition, and deceptive and unfair trade practices cannot withstand summary judgment.

Although the Florida dilution statute does not require the mark to be "famous," Florida courts do require the mark to be "highly distinctive" or for there to be some proof that the use of a trademark decreases the plaintiff's commercial value. *See Great Southern Bank v. First Southern Bank,* 625 So.2d 463, 470–71 (Fla.1993); *Freedom Sav. and Loan Ass'n v. Way,* 757 F.2d 1176, 1186 (11th Cir. 1985). The Court has already found that HBP's "Daytona" marks are not sufficiently strong to merit protection and that HBP has not presented evidence of a loss of commercial value. The Court has already determined that HBP's "Daytona" marks lack distinctiveness and HBP has failed to present evidence of a commercial (or any) loss from American Marine's use of "Daytona" on its DONZI boats; thus, HBP's state claim for dilution must fail. *See Carnival Corp. v. SeaEscape Casino Cruises, Inc.,* 74 F.Supp.2d 1261, 1271 (S.D.Fla. 1999).

### CONCLUSION

It is **ORDERED** that American Marine's Amended Motion for Summary Judgment (Doc. No. 34) is **GRANTED.** The Clerk is **DIRECTED** to enter judgment in favor of Defendant, dismissing all of Plaintiff's claims with prejudice and awarding Defendant its costs of the action. All other pending motions (Doc. Nos. 46, 47, 50, 51, 52, 53, 54) are **DENIED** as moot.